DENNIS, Circuit Judge:
The issues in this case are (1) whether a telecommunications carrier is barred by the Eleventh Amendment from bringing suit in federal district court *639 against a state public service commission under Section 252(e)(6) of the Telecommunications Act of 1996, 47 U.S.C. § 151, et seq. (1996 Act or Act), for judicial review of whether the commission’s arbitration determination with respect to an interconnection agreement meets the requirements of § 151 of the Act and applicable FCC regulations; and (2) whether the carrier may bring an action under the Ex parte Young doctrine in federal court against the individual members of a state public service commission in their official capacities for prospective relief from their arbitration determination contrary to the requirements of § 251 of the Act and its implementing regulations.[1] The district court held that the plaintiff telecommunications carriers were barred by Eleventh Amendment immunity from bringing such actions and dismissed their suits. We reverse and remand the case for further proceedings in accordance with the 1996 Act and the Ex parte Young doctrine.
In the 1996 Act Congress pre-empted the states in the regulation of local telecommunications competition with regard to all matters addressed by the Act. The Act offers state public service commissions the option, however, of approving or rejecting, pursuant to §§ 251 and 252 of the Act, any interconnection agreement between carriers adopted by negotiation or arbitration. If the state public service commission declines such offer in any proceeding under the Act, the FCC is required to assume the responsibility of acting upon that matter. In a case in which the state public service commission accepts the responsibility offered and makes a determination under the Act, any party aggrieved by such determination may bring an action in an appropriate federal district court to determine whether the agreement meets the requirements of §§ 251 and 252. The 1996 Act provides that no state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under the Act.
When the Louisiana Public Service Commission (LPSC) accepted Congress’s offer to function as an arbitrator under the Act in determining and approving the interconnection agreement in the present case, the regulation of local telecommunications competition and related interconnection agreements was no longer a permissible or lawful activity within the states’ own powers. When Congress bestows a gift or gratuity upon a state of a benefit which cannot be obtained by the state’s own power, Congress may attach to the gratuity the condition of a voluntary waiver by the state of its Eleventh Amendment immunity. Consequently, the LPSC voluntarily waived its state immunity when it accepted the Congressional offer of a gratuity that was clearly conditioned upon the LPSC’s amenability to federal suits by private parties under the Act and arbitrated the interconnection dispute in the present case.[2]
*640 The LPSC commissioners allegedly determined and approved an interconnection agreement that violates the requirements of the 1996 Act, and the aggrieved carriers bound by the determination seek prospective injunctive relief against the commissioners in their official capacities to terminate further operation of the agreement against them; therefore, the doctrine of Ex parte Young permits the suit to proceed against the commissioners.
I. The Telecommunications Act of 1996
A. Background; Preemption of State Regulatory Jurisdiction
In AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 371-373, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), the Supreme Court succinctly described the context and content of the 1996 Act:
Until the 1990s, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network. Technological advances, however, have made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies.
[The 1996 Act] fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC’s obligation under 47 U.S.C. § 251(c) (1994 ed., Supp. II) to share its network with competitors. Under this provision, a requesting carrier can obtain access to an incumbent’s network in three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent’s network “on an unbundled basis”; and it can interconnect its own facilities with the incumbent’s network. When an entrant seeks access through any of these routes, the incumbent can negotiate an agreement without regard to the duties it would otherwise have under § 251(b) or (c). See § 252(a)(1). But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder.
(footnotes omitted).
The FCC issued its First Report and Order implementing local competition provisions under the 1996 Act six months after its passage. In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCCR 15499, 1996 WL 452885 (1996) (First Report & Order). Numerous challenges to the FCC’s rulemaking by incumbent LECs and state utility commissions were consolidated in the Eighth Circuit. The Court of Appeals vacated the FCC’s pricing rules and several other aspects of the First Report and Order, as reaching beyond the Commission’s jurisdiction. Iowa Utilities Board v. FCC, 120 F.3d 753, 800, 804, 805-806 (8th Cir.1997). It held that the general rulemaking authority con *641 ferred upon the FCC by the Communications Act of 1934 extended only to interstate matters, and that the FCC therefore lacked the specific congressional authorization it needed for implementing provisions of the 1996 Act addressing intrastate communications. Id. at 795.
The Supreme Court in Iowa Utilities reversed on the main point, holding that the FCC has general jurisdiction to implement the 1996 Act’s local-competition provisions. The Court concluded that since Congress expressly directed that the 1996 Act be inserted into the Communications Act of 1934, and since the 1934 Act already provides that the FCC “may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act,” 47 U.S.C. § 201(b), the FCC’s rulemaking authority extends to implementation of §§ 251 and 252. “We think that the grant in § 201(b) means what it says: The FCC has rule-making authority to 'carry out the ‘provisions of this Act,’ which include §§ 251 and 252, added by the Telecommunications Act of 1996.” Id. at 378, 119 S.Ct. 721, Furthermore, the Court held that section 152(b) of the Communications Act of 1934, which provides that “nothing in this chapter shall be construed to apply or to give the [FCC] jurisdiction with respect to ... intrastate communications service ...” does not change this conclusion because the 1996 Act clearly applies- to intrastate matters. Id. at 379-380, 119 S.Ct. 721.
Significantly for purposes of deciding the Eleventh Amendment issues in the present case, the Court in Iowa Utilities, in answer to arguments of the dissenters relying on the presumption against preemption of state regulatory power, responded that the 1996 Act clearly manifested Congress’s intent to supplant traditional state police power regulation of local telecommunications competition:
But the question in this case is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to matters addressed by the 1996 Act, it unquestionably has. The question is whether the state commissions’ participation in the administration of the new federal regime is to be guided by federal-agency regulations. If there is any “presumption” applicable to this question, it should arise from the fact that a federal program administered by 50 independent state agencies is surpassing strange. The appeals by both Justice THOMAS and Justice BREYER to what might loosely be called “States’ rights” are most peculiar, since there is no doubt, even under their view, that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel. This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the federal courts that draw the lines to which they must hew. To be sure, the FCC’s lines can be even more restrictive than those drawn by the courts-but it is hard to spark a passionate “States’ rights” debate over that detail.
Id. at 378 n. 6, 119 S.Ct. 721 (emphasis added). “After the 1996 Act, § 152(b) [§ 2(b) of the 1934 Act, which excluded intrastate communications from the FCC’s jurisdiction] may have less practical effect. But that is because Congress, by extending the Communications Act into local competition, has removed a significant area from the States’ exclusive control." Id. at 381 n. 8, 119 S.Ct. 721 (emphasis added). See also Texas Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 423-24 (5th Cir. 1999), cert granted, — U.S. -, 120 S.Ct. 2214, 147 L.Ed.2d 247 (2000)(recog-nizing Iowa Utilities’ holding that state regulation of intrastate telecommunications competition is preempted under §§ 251 and 252 but refusing to extend that holding to § 254 of the Act).
*642 B. Procedures Under the 1996 Act; Optional Role Of State Commissions; FCC Preemption; Federal Judicial Review
Upon receiving a request for interconnection, services, or network elements pursuant to Section 251 of the Act, an incumbent LEC may negotiate and enter into a binding agreement with the requesting carrier which must be submitted to the state commission. § 252(a)(1). During negotiations, any party may ask the state commission to mediate differences. § 252(a)(2). Any party to the negotiation may petition a state commission to arbitrate any open issues during the period from the 135th to the 160th day after the initial request for negotiation. § 252(b)(1). The state commission resolving open issues by arbitration must ensure that its resolution and imposition of conditions meets the requirements of § 251 and FCC regulations. § 252(c). The state commission may only reject an agreement adopted by negotiation if it discriminates against a non-party carrier; is not consistent with the public interest, convenience, and necessity; or does not meet the requirements of §§ 251 and 252(d) and FCC regulations. § 252(e)(2). Subject to § 253, the state commission may also establish or enforce other requirements of state law in its review of an agreement. § 252(e)(3). No state court shall have jurisdiction to review the action of the state commission in approving or rejecting an agreement under this section. Id. If the state commission fails to act or to carry out its responsibility under § 252(e), the FCC shall issue an order preempting the state commission’s jurisdiction of that proceeding or matter, assume the responsibility offered to the commission with respect to that matter, and perform the functions that had been offered to the state commission. § 252(e)(5). “In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.” § 252(e)(6).
II. Facts and Procedural History
In 1997 AT&T Communications attempted to negotiate an interconnection agreement under §§ 251 and 252 of the 1996 Act with BellSouth, the local exchange carrier in Louisiana. When the parties failed to reach an agreement on several elements of the interconnection agreement, AT&T Communications petitioned the LPSC to arbitrate the issues pursuant to § 252(b). LPSC accepted the responsibility as arbitrator under § 252(e)(4) and resolved the issues substantially in BellSouth’s favor. AT&T Communications brought this action against BellSouth, the LPSC, and the individual commissioners of the LPSC in the Middle District of Louisiana pursuant to § 252(e)(6), contending that the LPSC arbitration determination does not meet the requirements of §§ 251 and 252 and the FCC regulations. 'The defendants answered on the merits. The district court, however, requested that the parties brief whether the suits against the LPSC and its officers were barred by the Eleventh Amendment. After briefing, the district court dismissed the actions as to all defendants, holding that suit against the LPSC was barred by the Eleventh Amendment, and that suit against the individual commissioners could not be maintained under Ex parte Young. AT&T Communications of the South Central States, Inc. v. BellSouth Telecommunications, Inc., 43 F.Supp.2d 593 (M.D.La.1999). AT&T filed timely notices of appeal.
III. Discussion
AT&T presents two principal arguments for reversal of the district court’s interpretation and application of the Eleventh Amendment and Ex parte Young: (1) the LPSC waived its Eleventh Amendment immunity by voluntarily accepting and performing its assigned role in the federal regulation of local competition under the 1996 Act; and (2) AT&T’s suit, in any *643 event, may proceed against the individual commissioners under the doctrine of Ex parte Young.
Whether a state is entitled to Eleventh Amendment immunity is a question of law that this court reviews de novo. Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir.1999); United States ex rel. Foulds v. Texas Tech University, 171 F.3d 279, 288 (5th Cir.1999), cert. denied, — U.S. -, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000).
A. State Sovereign Immunity Generally
The Eleventh Amendment to the Constitution of the United States provides: “The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.” Further, as long construed by the Supreme Court, federal judicial power does not extend to suits brought against a state or its agencies by its own citizens. See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment also bars federal jurisdiction over suits against state officials acting in their official capacities when the state is the real party in interest. See, e.g., Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).
Eleventh Amendment immunity from suit is not absolute. College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Congress may authorize a private party to bring a federal court suit against unconsenting states in the exercise of its power to enforce the Fourteenth Amendment. Kimel v. Florida Bd. of Regents, 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); College Savings, 527 U.S. at 670, 119 S.Ct. 2219 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). A state may waive its sovereign immunity by consenting to suit. College Savings, 527 U.S. at 670, 119 S.Ct. 2219 (citing Clark v. Barnard, 108 U.S. 436, 447-448, 2 S.Ct. 878, 27 L.Ed. 780 (1883)). Additionally, the Supreme Court has for nearly a century allowed suits against state officials for prospective injunctive relief to end a continuing violation of federal law under the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
In Seminole Tribe v. Florida, 517 U.S. 44, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court held that Congress cannot abrogate Eleventh Amendment immunity through the exercise of its Article I powers. “Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States.” Id. at 72, 116 S.Ct. 1114; see College Savings, 527 U.S. at 672, 119 S.Ct. 2219. Consequently, AT&T correctly does not contend that Congress abrogated the states’ Eleventh Amendment immunity by enactment of the 1996 Act under its Article I power to regulate interstate commerce. Instead, this case turns on waiver and Ex parte Young.
B. Waiver
The Supreme Court has “long recognized that a State’s sovereign immunity is ‘a personal privilege which it may waive at [its] pleasure.’ ” College Savings, 527 U.S. at 675, 119 S.Ct. 2219 (quoting Clark, 108 U.S. at 447, 2 S.Ct. 878). “The decision to waive that immunity, however, ‘is altogether voluntary on the part of the sovereignty.’” Id. (quoting Beers v. Arkansas, 61 U.S. (20 How.) 527, 529, 15 L.Ed. 991 (1857)). Generally, the Court will find a waiver either if the state volun *644 tarily invokes its jurisdiction, Gunter v. Atlantic Coast Line R.R. Co., 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906), or if the state makes a “clear declaration” that it intends to submit itself to the court’s jurisdiction. College Savings, 527 U.S. at 675-76, 119 S.Ct. 2219 (quoting Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)).
In College Savings, the Court held that the Eleventh Amendment immunity of the state education expense board (“the Board”), an arm of the State of Florida, had not been voluntarily waived by the Board’s alleged false advertising in interstate commerce. 527 U.S. at 680-81, 119 S.Ct. 2219. The petitioner, a New Jersey bank, had brought suit against the Board alleging unfair competition under the Lan-ham Act based on the Board’s alleged false advertising of its tuition savings plans in its brochures and annual reports. The pertinent federal statutes, the Trademark Remedy Clarification Act and the Lanham Act, expressly subjected the states to suits brought under them for false and misleading advertising.
The New Jersey bank relied upon Parden v. Terminal Railway of Alabama State Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), in which the Supreme Court had recognized a not altogether volitional “constructive-waiver” theory, when it permitted employees of a railroad owned and operated by Alabama to bring an action under the FELA against the State as their employer. Although the FELA did not refer to the states, the Parden Court held that, under the facts of that case, the Act authorized the FELA action against Alabama as a “common carrier by railroad ... engaging in commerce between ... the several States,” 45 U.S.C. § 51 (1940 ed.). See College Savings, 527 U.S. at 666-67, 119 S.Ct. 2219. Even though Alabama law expressly disavowed any such waiver, the Parden majority held that “[b]y enacting the [FELA] ... Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.” Parden, 377 U.S. at 192, 84 S.Ct. 1207.
The Supreme Court in College Savings, however, expz*essly overruled Parden and its “constructive-waiver experiment [as] ill conceived.” 527 U.S. at 680, 119 S.Ct. 2219. The Court stated that “there is little reason to assume actual consent based upon the State’s mere presence in a field subject to congressional regulation!;] ... the most that can be said ... is that the State has been put on notice that Congress intends to subject it to suits brought by individuals^] ... [and][t]hat is very far from concluding that the State made an ‘altogether voluntary’ decision to waive its immunity.” Id. at 680-681, 119 S.Ct. 2219 (quoting Beers, 61 U.S. at 529). More is required as a reasonable basis for inferring that the state, by engaging in a federally-regulated activity, voluntarily consented to being sued by individuals in federal court based on the federal law. See id.
Consequently, the College Savings Court concluded that a state voluntarily waives its Eleventh Amendment immunity by engaging in activity subject to congressional regulation only if (1) the state has been put on notice clearly and unambiguously by the federal statute that the state’s particular conduct or transaction will subject it to federal court suits brought by individuals; (2) the state may refrain from engaging in the particular actions without excluding itself from activities otherwise lawfully within its powers; and (3) the state elects to engage in the conduct or transaction after such legal notice has been given. See 527 U.S. at 675-87, 119 S.Ct. 2219. These waiver requirements are most clearly illustrated by the Court’s discussion of the fundamental differences betweén College Savings and two prior cases involving constitutionally permissible *645 conditions attached to gratuities offered to the states by Congress.
In Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), the Court had held “that a bistate commission which had been created pursuant to an interstate compact (and which we assumed partook of state sovereign immunity) had consented to suit by reason of a suability provision attached to the congressional approval of the compact.” College Savings, 527 U.S. at 686, 119 S.Ct. 2219. And in such cases as South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), the Court had held “that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the action.” College Savings, 527 U.S. at 686,119 S.Ct. 2219.
The fundamental difference between the College Savings case and the Petty and Dole cases, as the Court cogently pointed out, lies in the distinction between the types of Congressional acts involved. In the statutes involved in the latter cases, Congress had obtained the states’ voluntary consent to conditions attached to gratuities-a voluntary waiver of sovereign immunity for an interstate compact in Petty, and an increase in the drinking age for federal highway funds in Dole. Neither gratuity was attainable by the state through lawful activities within the state’s own powers. In contrast, College Savings involved federal statutes that forced a state’s not “altogether voluntary” waiver by threat of exclusion from otherwise lawful activity within its power. The Court explained:
These cases seem to us fundamentally different from the present one. Under the Compact Clause, U.S. Const., Art. I, § 10, cl. 3, States cannot form an interstate compact without first obtaining the express consent of Congress; the granting of such consent is a gratuity. So also, Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity. Justice BREYER’s dissent acknowledges the intuitive difference between the two, but asserts that it disappears when the gift that is threatened to be withheld is substantial enough. Perhaps so, which is why, in cases involving conditions attached to federal funding, we have acknowledged that “the financial inducement offered by Congress might be so coercive as to pass the point at which ‘pressure turns into compulsion.’ ” Dole, supra, at 211, 107 S.Ct. 2793 quoting from Chas C. Steward Machine Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). In any event, we think where the constitutionally guaranteed protection of the States’ sovereign immunity is involved, the point of coercion is automatically passed-and the vol-untariness of waiver destroyed-when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity.
527 U.S. at 686-87, 119 S.Ct. 2219.
For these reasons, we agree with the Tenth and Seventh Circuits’ conclusion that, after College Savings, Congress may still obtain a non-verbal voluntary waiver of a state’s Eleventh Amendment immunity, if the waiver can be inferred from the state’s conduct in accepting a gratuity after being given clear and unambiguous statutory notice that it was conditioned on waiver of immunity. See MCI Telecommunications Corp. v. Illinois Bell Tel. Co., 222 F.3d 323, 339 (7th Cir.2000) (In College Savings, 527 U.S. at 687, 119 S.Ct. 2219, “the Court simply held that states cannot ‘constructively[1] waive their immunity by being forced by Congress to choose between preserving their sovereign immunity *646 and engaging in an ‘otherwise lawful activity.’ ”); MCI Telecommunications Corp. v. Pub. Serv. Comm’n of Utah, 216 F.3d 929, 937 (10th Cir.2000) (“A constructive waiver is voluntary only where Congress threatens a state with the denial of a ‘gift or gratuity’ if the state refuses to consent to suit in federal court. Where Congress threatens a state with a ‘sanction’ if it refuses to consent to suit, then the waiver is no longer freely given.”) (citation omitted). A state’s voluntary waiver of immunity, inferred from the state’s acceptance of a Congressional gratuity that it was free to decline without loss of any sovereign prerogative, was distinguished by the Supreme Court in College Savings from “the type of ‘forced waiver’ exacted by Congress under Parden, whereby the state is threatened with the sanction of waiving its immunity if it engages in a regulated enterprise, [as] really an abrogation of the state’s immunity prohibited by Seminole Tribe.” Illinois Bell, 222 F.3d at 340 (citing College Savings, 527 U.S. at 690, 119 S.Ct. 2219 as “noting that forced waiver and abrogation are ‘the same side of the same coin’ ”); (citing also Chavez v. Arte Publico Press, 204 F.3d 601, 604 n. 5 (5th Cir.2000) (“College Savings expressly overruled Parden and its implied waiver theory. That theory is no longer available to support an Article I abrogation of Eleventh Amendment Immunity.”)).
We also join the Seventh and Tenth Circuits in concluding that the 1996 Act does not potentiate the exaction of a “forced waiver” of Eleventh Amendment immunity from the states. See Illinois Bell, 222 F.3d at 342-44; Pub. Serv. Comm’n, 216 F.3d at 938-39, 939 n. 6. The Act only establishes a basis for a voluntary gratuity induced waiver that states may accept or reject, and it does not require the states as a condition of accepting the gratuity to abandon any lawful activity currently within their powers. Illinois Bell, 222 F.3d at 343-344; Pub. Serv. Comm’n, 216 F.3d at 938.
After passage of the 1996 Act, regulation of competition among providers of local phone service is no longer within the province of states’ inherent authority. Congress, by enacting the 1996 Act pursuant to its commerce power, validly preempted the states’ power to regulate local telecommunications competition. Iowa Utilities, 525 U.S. 366, 378 n. 6, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (“With regard to the matters addressed by the 1996 Act, [the Federal Government] unquestionably has [taken the regulation of local telecommunications competition away from the States].”); see also FERC v. Mississippi, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (“[T]he commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities.”). Accordingly, Congress established a federal system headed by the FCC to regulate local telecommunications competition. The Act permissibly offers state regulatory agencies a limited mission, which they may accept or decline: to apply federal law and regulations as arbitrators and ancillary regulators within the federal system and on behalf of Congress. 42 U.S.C. § 252. Cf. Hodel v. Virginia Surface Mining & Reclamation Assn., 452 U.S. 264, 290, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (“Thus, Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.”).
Section 252(e)(6) of the Act plainly states that “any party aggrieved by” a state commission’s determination, which necessarily will include private individuals, may bring an action in an appropriate federal district court, and § 252(e)(4) provides that no state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under this section. We agree with the Seventh Circuit that “Congress has expressed unmistakably that, under [the Act], states could participate in the *647 federal regulatory function delegated to them by the federal government on the condition that their participation be reviewed in federal court” and that the “Act satisfies the requirement that Congress clearly state that participation by the state in the regulatory scheme entails a waiver of immunity from suit in federal court.” Illinois Bell, 222 F.3d at 341; see also Pub. Serv. Comm’n, 216 F.3d at 938.
When the LPSC accepted Congress’s offer under the 1996 Act to delegate federal authority to the state commission to act as an arbitrator in the present case, the regulation of interconnection agreements covered by the 1996 Act was no longer a permissible or lawful activity within the power of the states. As in Petty and Dole, Congress was under no obligation to offer states something they could not obtain on their own, viz., participation in the 1996 Act’s federal regulation of local telecommunications competition. Also, as in those cases, the state was free to accept or reject such participation as a gratuity without abstaining from any lawful activity within its power. College Savings made clear that when Congress bestows a gift or gratuity, it may attach the condition of a waiver of Eleventh Amendment immunity to a state’s acceptance. 527 U.S. at 686-87, 119 S.Ct. 2219. Consequently, the LPSC voluntarily waived its state immunity when it accepted the Congressional offer of a gratuity and arbitrated the interconnection dispute in this case.
C. Application of Ex -parte Young
We agree with the Sixth, Seventh, and Tenth Circuits that a suit such as this one, brought by AT&T Communications for injunctive relief against the individual members of the LPSC because a determination made by the commissioners is allegedly contrary to the 1996 Act, is a “straight forward” Ex parte Young case. Illinois Bell, 222 F.3d at 345; Pub. Serv. Comm’n, 216 F.3d at 939; Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867 (6th Cir.2000), cert. denied, — U.S. -, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000). Therefore, even if Plaintiffs’ suit against the LPSC were barred by the Eleventh Amendment, the suit for prospective in-junctive relief could proceed against the individual commissioners in their official capacities.
Under the Ex parte Young doctrine, a private party may sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Idaho v. Coeur d’Alene Tribe, 521 U.S. 261, 294, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (O’Connor, J., concurring); id. at 298-99, 117 S.Ct. 2028 (Souter, J. dissenting); Ysleta Del Sur Pueblo v. Laney, 199 F.3d 281, 289 (5th Cir.2000), cert. denied, — U.S. -, 120 S.Ct. 2007, 146 L.Ed.2d 957 (2000); Earles v. State Bd. of Certified Public Accountants of Louisiana, 139 F.3d 1033, 1039 (5th Cir.1998). The purpose of the doctrine is to enable federal courts to “vindicate federal rights and hold state officials responsible to ‘the supreme authority of the United States.’ ” Pennhurst, 465 U.S. at 105, 104 S.Ct. 900 (quoting Ex parte Young, 209 U.S. at 160, 28 S.Ct. 441). In the present case, AT&T Communications filed suit against the individual LPSC commissioners in their official, rather than personal, capacities. AT&T Communications alleges that the arbitral determination of the interconnection agreement by the commissioners violates the 1996 Act, a federal law. As the interconnection agreement determination binds present and future relations between AT&T Communications and BellSouth, the alleged violation of federal law is on-going. Finally, an order preventing the commissioners from enforcing provisions of the agreement which fail to meet the requirements of the 1996 Act will be purely prospective.
The LPSC commissioners counter that the present case fits within the exception to Ex parte Young recognized by the Supreme Court in Seminole Tribe of Florida *648 v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Court in Seminole Tribe held that suits against individual state officers in their official capacities for on-going violations of federal law are not available when Congress has enacted a comprehensive remedial scheme intended to be the sole remedy for violations of federal law. Id. at 74, 116 S.Ct. 1114. Because the remedial scheme prescribed by Congress under the 1996 Act is significantly different from the congressional plan considered by the Court in Seminole Tribe, and does not manifest an intent to exclude Ex parte Young suits, we disagree with the commissioners’ contention that Seminole Tribe precludes application of the Ex parte Young exception in this case.
_ In Seminole Tribe, the Supreme Court noted that the Indian Gaming Regulatory Act (“IGRA”) provided that the sole judicial remedy available under the act upon failed negotiations between the State and the plaintiffs was a court order requiring mediation between the parties. Id. If such mediation failed, the result under IGRA’s elaborate remedial scheme was preemption of any proposed agreement between the parties by regulations issued by the Secretary of the Interior. Id. at 74-75, 116 S.Ct. 1114. The Court thus noted that the powers of the federal district court under IGRA were limited “significantly,” id. at 76, 116 S.Ct. 1114; in comparison, the Court recognized that “an action brought against a state official under Ex parte Young would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions.” Id. at 75, 116 S.Ct. 1114. The Court stated that “the fact that Congress [under IGRA] chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young strongly indicates that Congress had no wish to create the latter under [IGRA].” Seminole Tribe, 517 U.S. at 75-76, 116 S.Ct. 1114.
The 1996 Act, however, does not severely limit relief available to an aggrieved party as does the IGRA. Section 252(e)(6) of the 1996 Act simply provides that, if the state commission makes a determination under that section, any aggrieved party may bring suit in federal court to determine whether the determination meets the Act’s requirements. The 1996 Act does not limit jurisdiction of federal courts to entertain suits in law or equity for prospective relief from on-going violations of federal law by state officials acting in their official capacities. It thus cannot be said that Congress intended in the 1996 Act to limit significantly the federal judicial remedies available to an aggrieved party authorized to bring suit in an appropriate federal court.[3] See Illinois Bell, 222 F.3d at 346 (“The power of the court under subsection 252(e)(6) stands in stark contrast with the court’s powers to impose what the Supreme Court called a ‘modest set of sanctions’ under the statute at issue in Seminole Tñbe.”)(citing Seminole Tribe, 517 U.S. at 75, 116 S.Ct. 1114).
Appellees also argue that the Supreme Court’s decision in Idaho v. Coeur d’Alene Tribe, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), precludes applicability of Ex parte Young to the present case. However, this circuit has rejected the idea that Coeur d’Alene affects the traditional application of Ex parte Young:
We concur with the consensus among other courts that although the principal opinion in Coeur d’Alene suggests a case-by-case (rather than rule-based) ap *649 proach to the application of Ex parte Young, see Coeur d’Alene, 521 U.S. 261, 276-282, 117 S.Ct. at 2038-2040, 138 L.Ed.2d 438 (opinion of Kennedy, J.), this part of the opinion did not muster a majority, and a majority of the Court would continue to apply the rule of Ex parte Young as it has been traditionally understood, see id. at 296, 117 S.Ct. at 2047 (O’Connor, J., concurring in part and concurring in the judgment (joined by Scalia and Thomas, JJ.)); id. at 297, 117 S.Ct. at 2048 (Souter, J., dissenting (joined by Stevens, Ginsburg, and Breyer, JJ.)).
Earles v. State Bd. of Certified Public Accountants of Louisiana, 139 F.3d 1033, 1039 (5th Cir.1998).
Accordingly, the application of Ex parte Young to suits against state commissioners under section 252(e)(6) of the 1996 Act remains unaffected by either Seminole Tribe or Coeur d’Alene. See Illinois Bell, 222 F.3d 323, 347 (7th Cir.2000); Pub. Serv. Comm’n, 216 F.3d 929, 940 (10th Cir.2000); and Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867 (6th Cir.1999).
IV. Conclusion
Because the LPSC voluntarily waived the state’s Eleventh Amendment immunity in the present case, we REVERSE the decision of the district court dismissing AT&T Communication’s suit against LPSC. Because the Ex parte Young doctrine applies, we also REVERSE the decision of the district court dismissing AT&T Communication’s suit against the individual commissioners. The case is REMANDED for further proceedings consistent with this opinion.

. AT&T also contends that the Eleventh Amendment is not applicable because the present case involves mere judicial review of the record and is not a suit in law or equity against the Louisiana Public Service Commission ("LPSC”) for purposes of the Eleventh Amendment. We do not accept this argument. In the present case AT&T Communications named the LPSC as a defendant, process was served on it, and it was required to suffer the indignity of being compelled to appear before a federal court.
A "suit in law or equity” exists against a sovereign state for purposes of the Eleventh Amendment when a plaintiff has served compulsory process upon that state as defendant in a matter. See Missouri v. Fiske, 290 U.S. 18, 28, 54 S.Ct. 18, 78 L.Ed. 145 (1933); Cohens v. Virginia, 6 Wheat. 264, 19 U.S. 264, 407-408, 5 L.Ed. 257 (1821). See also Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.”) (citing In re Ayers, 123 U.S. 443, 505, 8 S.Ct. 164, 31 L.Ed. 216 (1887)) (emphasis added).

. In this opinion, for convenience and hopefully some clarity, we refer to all of the parties and non-parties which have adopted the position on appeal of plaintiff-appellant AT&T *640 Communications collectively as "AT&T.” This includes plaintiff-appellant American Communications of Louisiana; defendant-appellant BellSouth; the United States and the Federal Communications Commission (“FCC”), inlervenors; and Amicus Curiae Sprint Communications Company. In certain instances we refer to AT&T Communications and American Communications of Louisiana jointly as "AT&T Communications.”
AT&T Communications and American Communication Services of Louisiana also appeal from the district court’s determination that the LPSC is an indispensable party to this litigation. Our reversal of the district court's judgment moots the indispensable party issue.

. The LPSC and its commissioners contend that because review under section 252(e)(6) is limited in subject matter to a determination of "whether the agreement or statement [as determined by the state commission] meets the requirements of section 251,” the remedial scheme created by the 1996 Act is more limited than traditional Ex parte Young suits, and therefore such suits with respect to the Act are precluded under Seminole Tribe. However, this limitation defines the courts' subject matter jurisdiction in all suits brought to enforce the provisions of the 1996 Act rather than the relief available in such a suit. Therefore, the Act does not prohibit the application of the Ex parte Young doctrine.

. “In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.” 47 U.S.C. § 252(e)(6).