# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2021

Lyle W. Cayce
Clerk

No. 20-60051

Texas Education Agency,

*Petitioner*,

*versus*

United States Department of Education,

*Respondent*.

Petition for Review of an Order of
the United States Department of Education
No. 19-73-CP

Before Higginbotham, Smith, and Dennis, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

The National Defense Authorization Act of 2013 ("NDAA") prohibits any recipient of federal dollars from retaliating against whistleblowers who report an abuse of that money. Laurel Kash filed a complaint with the U.S. Department of Education ("DOE"), alleging that the Texas Education Agency ("TEA") had discharged her in retaliation for whistleblowing; the TEA maintains it did so for legitimate reasons.

The DOE investigated Kash's complaint, credited it, and awarded her damages. The TEA contends that violated Texas's sovereign immunity.

No. 20-60051

Agreeing with the TEA, we grant the petition for review, vacate the offending order, and remand for prompt entry of dismissal.

I.

Congress enacted a broad-based whistleblower protection program as part of the NDAA.[1] The operative provision reads as follows:

> An employee of a contractor, subcontractor, grantee, or sub-grantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1). The NDAA, by its terms, applies to *any* federal contract or grant and is not limited to a particular appropriation or class of grant.[2]

If an employee believes he was subject to unlawful retaliation, he submits a complaint to the Inspector General of the agency responsible for the relevant federal money, at which point that agency investigates the complaint and determines whether the employer unlawfully retaliated. *See id.* § 4712(b)(1)–(2)(A). Depending on its findings, the agency then issues an

---

[1] *See* Pub. L. No. 112-239, 126 Stat. 1632, 1837–40 (2013) (codified at 41 U.S.C. § 4712); *see also* Pub. L. No. 114-261, 130 Stat. 1362, 1362 (2016) (making the program permanent).

[2] *Compare id., with* American Recovery and Reinvestment Act of 2009, Pub L. No. 111–5, § 1553, 123 Stat. 115, 297 (2009) (limiting its application to stimulus funds appropriated under the act), *and* 10 U.S.C. § 2409(a)(1)(A)–(B) (limiting its application to Department of Defense and NASA contracts and grants).

order denying or granting relief, which can include reinstating the whistle-blower, otherwise abating the adverse employment action, and paying damages that can cover backpay and attorney's fees. *See id.* § 4712(c)(1)(A)–(C). Any person aggrieved by that order (i.e., a complainant denied relief or an employer ordered to give relief) may petition the appropriate U.S. Court of Appeals for review, which conforms with the provisions for judicial review in the Administrative Procedure Act ("APA"). *Id.* § 4712(c)(5).

Kash was hired as the TEA's Director of Special Education in the summer of 2017. During the hiring process, the TEA conducted a background check in which it discovered allegations that Kash had kissed a high school student at her previous job in Oregon. Kash explained that the allegations were false, had been made by a disgruntled and discredited colleague, and had been rejected by Oregon state officials. The TEA hired Kash despite the allegations because she had been exonerated.

Kash's employment at the TEA got off to a rocky start. She reported directly to Justin Porter, who observed and received reports of Kash's allegedly unprofessional behavior throughout the early parts of her tenure. He held multiple counseling sessions with her in her first few months.

In October, Kash voiced her concerns about the TEA's data analysis contract with an entity called SPEDx, funded with money granted under the Individuals with Disabilities Education Act ("IDEA"). Kash told Porter she believed the contract was unnecessary and that it was awarded because the SPEDx contractor and a sub-contractor were friends of Penny Schwinn, Porter's direct supervisor. Schwinn caught wind of those allegations and discussed them with Kash and Porter. The same day as that conversation, Kash reported her concerns about the SPEDx contract to Bill Wilson, the TEA's Director of Internal Audit. She repeated her belief that the contract was awarded because the contractor and sub-contractor had a personal rela-

No. 20-60051

tionship with Schwinn, and she added a concern that the contract was inappropriately awarded on a sole-source basis.

The following month, Porter issued Kash a formal letter of reprimand that alleged instances of Kash's purported unprofessionalism and inappropriate communications with external stakeholders. The letter also discussed Kash's complaints about the SPEDx contract, saying that, although Kash could report the allegations through appropriate channels, it was inappropriate to voice her complaints in the way that the letter asserted she had. The letter said that voicing those concerns to external stakeholders in particular could undermine Schwinn's reputation and negatively impact the TEA. Shortly thereafter, Kash followed up with Wilson about her concerns with the SPEDx contract and expressed her fear that she would be fired.[3]

A few weeks later, an allegation became public that Kash had "tried to cover up the physical and sexual abuse of a six-year-old special education student and retaliated against the teaching assistants who reported it." The teaching assistants had filed a lawsuit in Oregon detailing those allegations. And the TEA received emails from members of the public concerned about the allegations. Upon learning of the lawsuit, Porter texted Kash that he was going to direct questions about the allegations to the TEA's communications director; Kash responded that she was not liable for anything and that the lawsuit was brought by "that crazy employee I told you about this summer."[4]

---

[3] Wilson opened a formal investigation into the SPEDx contract, in part at Schwinn's request. That investigation concluded that the contract was not improperly awarded. The DOE investigator, however, determined that the internal audit was not credible, because Wilson was not adequately independent. That finding was not a significant factor in the decision of the administrative law judge ("ALJ").

[4] The parties dispute whether the TEA knew of those allegations when it hired Kash. The TEA avers that the emails from the public were the first it learned of them. Kash, however, asserts that she informed the TEA of those allegations at the same time she

4

No. 20-60051

Days after the cover-up allegations broke, Kash filed a complaint about the SPEDx contract with the DOE Office of the Inspector General ("OIG"). Before that, the TEA had been discussing whether to terminate Kash's employment. The day after she filed her complaint, the TEA did so.[5]

Kash filed a whistleblower-retaliation complaint with the OIG the following September. She claimed that both her termination and the letter of reprimand she received were retaliation for her reporting legal problems with the SPEDx contract. The TEA maintained that it terminated her because she could no longer effectively do her public-facing job after the cover-up allegations broke. Following a yearlong investigation, the OIG "sustained Kash's allegations of whistleblower reprisal" based on her termination.[6]

After a full hearing, an ALJ agreed and ordered the TEA to pay Kash damages. The TEA petitions for review, claiming, among other things, that the investigation and award of damages violates Texas's sovereign immunity. Since that is a constitutional issue, our review is *de novo*.[7]

## II.

In general, states[8] are immune from federal agencies' adjudication of

---

discussed with the TEA the assertions of improper contact with a student. It is not necessary for us to opine on whether the DOE's findings on this point were arbitrary and capricious.

[5] The TEA may not have been aware of Kash's disclosure to the OIG when it decided to terminate her employment. But that's moot because the TEA was aware of her earlier disclosure to its internal auditor.

[6] The ALJ ruled that the letter of reprimand could not be retaliatory because the TEA was unaware of any protected disclosures Kash had made when it issued the letter. Neither side appeals that ruling.

[7] *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016).

[8] The TEA is entitled to sovereign immunity as an arm of the state. *Cf. Perez v.*

5

private parties' complaints in the same way they are immune from suit. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 747 (2002). The DOE and Kash submit different theories of why, despite that general rule, sovereign immunity does not bar the DOE's investigation and award of damages. Kash analogizes the proceeding to a suit brought by the United States, which would not be barred by sovereign immunity. The DOE contends that the TEA waived its immunity from whistleblower-retaliation claims because the NDAA conditions acceptance of federal money on such a waiver. Both theories fall short.[9]

## A.

Though states are immune from suits brought by private parties, "[i]n ratifying the Constitution, the States consented to suits brought by . . . the Federal Government." *Alden v. Maine*, 527 U.S. 706, 755 (1999). Kash contends that the NDAA's whistleblower-retaliation provision "reflects Congress's longstanding, but growing recognition of the indispensable role whistleblowers play in revealing waste, fraud, and abuse in federal grantmaking and contracting with a variety of parties, including states." On that basis,

---

*Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 327 (5th Cir. 2002) (finding that regional education service centers are arms of the state). Neither party suggests otherwise.

[9] A third theory that neither the DOE nor Kash posits is that Congress abrogated Texas's sovereign immunity through the NDAA. Congress does not need to spend money to induce states to waive their immunity; in some cases it can merely abrogate it. *See Allen v. Cooper*, 140 S. Ct. 994, 1000–01 (2020). Congress may do so only with "unequivocal statutory language," and even then, only where "it is a valid exercise of constitutional authority." *Id.* (cleaned up).

Not pressing this theory was a good choice, because the the NDAA lacks the "unequivocal statutory language" needed to constitute effective abrogation, given that it makes no mention of states or sovereign immunity. And, if it did, the harm the NDAA addresses is unrelated to the Fourteenth Amendment, as required for abrogation. *See id.* at 1001, 1003–04.

Kash theorizes that the DOE's investigation and order advance the United States' "interest in having state grantee compliance with federal law be unhindered by whistleblower retaliation." Therefore, she posits that the proceeding is less like one in which a private complainant hales the state before the administrative agency and more like a suit brought by the United States to defend its own interests.

Whether whistleblower-retaliation investigations into a state are constitutionally permissible because they advance the United States' interests is *res nova* in this circuit. For three reasons, they, like any other administrative proceedings brought by private parties, are barred by sovereign immunity.

First, the logic of *Alden* does not apply to whistleblower-retaliation investigations. In *Alden*, 527 U.S. at 756, the Court relied on the fact that "[s]uits brought by the United States itself require the exercise of political responsibility for each suit prosecuted against a State, a control which is absent from a broad delegation to private persons to sue nonconsenting States." But the NDAA lacks that control for whistleblower-retaliation investigations of nonconsenting states. Instead, it authorizes any "person who believes that the person has been subjected to a reprisal prohibited" by the NDAA to "submit a complaint," which the Inspector General *must*[10] investigate. 41 U.S.C. § 4712(b)(1). That is exactly the sort of "broad delegation to private persons" against which *Alden*, 527 U.S. at 756, drew a distinction.

Second, the reasoning in our *qui tam* caselaw is persuasive and applicable. The False Claims Act authorizes private citizens to sue on behalf of the

---

[10] "[T]he Inspector General *shall* investigate the complaint," unless it "is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant . . . ." 41 U.S.C. § 4712(b)(1) (emphasis added).

No. 20-60051

United States to recover its money from "any person" who falsely claims it. 31 U.S.C. §§ 3729(a)(1), 3730(b)(1). But where that "person" is a state, unless the United States intervenes, the suit is barred by sovereign immunity. *United States ex rel. Foulds v. Tex. Tech Univ.*, 171 F.3d 279, 294 (5th Cir. 1999).[11] That is because sovereign immunity bars suits "commenced or prosecuted against one of the United States by" a citizen.[12] And though "the United States is a real party in interest" in a False Claims Act *qui tam* action, that does not make it "the party who commences or prosecutes the suit." *Id.* at 289 (quotation omitted). Nor can the United States delegate to private citizens its authority to sue sovereign states. *Id.* at 291–94 (citing *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 785 (1991)). In sum, though the United States' money is at stake in *qui tam* cases, they are barred by sovereign immunity because they are commenced and prosecuted by a private citizen.

So too here. Kash's contention means, at most, that the United States is a party in interest in the whistleblower-retaliation proceeding. But the United States certainly did not commence the action; Kash, a private citizen, triggered the investigation by filing a complaint with the OIG. Nor did the United States prosecute the action; the OIG investigator played a neutral role in determining whether to recommend ordering *or denying* relief based on his

---

[11] *But see Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 802 (2000) (Stevens, J., dissenting) (reasoning that, because the *qui tam* relator is effectively an assignee of the United States' claim and because the Justice Department retains some supervision, sovereign immunity did not bar the suit). After *Foulds*, the Supreme Court interpreted the False Claims Act's reference to "person" not to include states, mooting the holding in *Foulds*. *See id.* at 787. Nonetheless, the reasoning in *Foulds*, though no longer relevant to the False Claims Act, is still good law.

[12] U.S. CONST. amend. XI; *see also Hans v. Louisiana*, 134 U.S. 1 (1890) (holding sovereign immunity bars suits against a state brought by its own citizens).

analysis of Kash's claim.  Thus, the reasoning in *Foulds* applies.

Third, "[w]e are always chary to create a circuit split," and accepting Kash's theory would do so.  *Alfaro v. Comm'r*, 349 F.3d 225, 229 (5th Cir. 2003).  In *Rhode Island Department of Environmental Management v. United States* ("*Rhode Island*"), 304 F.3d 31 (1st Cir. 2002), the court rejected a contention very similar to Kash's.  That case involved the whistleblower-protection provision of the Solid Waste Disposal Act, 42 U.S.C. § 6971, which, much like the NDAA, established an administrative scheme for employees who believe they were retaliated against to seek relief.  Four complainants brought claims to the Department of Labor, alleging that the Rhode Island agency retaliated against them, and Rhode Island sued to enjoin the administrative proceedings based on sovereign immunity.  In finding for the state, the First Circuit rejected the complainants' argument "that the Secretary, rather than the individual complainant, [was] the 'true' plaintiff . . . ." *Rhode Island*, 304 F.3d at 53.  The court reasoned that the administrative adjudication was not prosecuted by the Secretary, but, "[i]nstead, the individual complainant trie[d] a case against the employer, and the Secretary (through the ALJ) act[ed] as the neutral arbiter of law and fact." *Id.*  Therefore, unless the Secretary intervened as a party or *amicus curiae*, sovereign immunity barred the suit. *Id.*

As in *Rhode Island*, a private individual—Kash—tried a case against the employer—the TEA—and the Secretary (first through its OIG and then through an ALJ) acted as a neutral arbiter of law and fact.  Accepting Kash's argument would require rejecting the First Circuit's holding that this neutral role meant the Secretary was not the true plaintiff.

Kash contends we can distinguish *Rhode Island* on the ground that the NDAA applies only to states that have a contractual or grantor-grantee relationship with a federal agency, while the Solid Waste Disposal Act applied

even without such a relationship.  But that distinction is apropos of nothing.  The reasoning of *Rhode Island* does not rely on the lack of a relationship between the state and federal governments, but instead on the *role* the federal government played in the whistleblowers' claims.  And—grantor-grantee relationship or not—the federal government plays that same role in Kash's claim.  Nor is there any authority for the proposition that the existence of a contractual or grantor-grantee relationship is relevant to the state's consent to suit.  In fact, as discussed above, *Foulds* is to the contrary.

## B.

Though states are immune from suit by private parties, they can waive their immunity for particular types of cases.[13]  And "Congress can induce a state to do so by making waiver a condition of accepting federal funds." *Gruver*, 959 F.3d at 181 (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 277–79 (5th Cir. 2005) (en banc)).  The DOE contends that the NDAA conditions the acceptance of any federal grant or contract on waiving immunity from whistleblower retaliation claims related to that grant or contract.[14]  But the

---

[13] *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 180 (5th Cir. 2020), *cert. denied*, No. 20-494, 2020 WL 7132339 (U.S. Dec. 7, 2020).

[14] The DOE's argument differs from the ALJ's reason for rejecting the TEA's sovereign immunity argument.  The ALJ looked specifically at whether the IDEA conditioned the receipt of federal funds on waiver, and, finding that it did, held the TEA had waived immunity from the NDAA by receiving IDEA funds.  But, as both parties now recognize, that reasoning is erroneous because the IDEA waiver is limited to violations of the IDEA.  *See* 20 U.S.C. § 1403.

The agency's shifting rationale on appeal raises the specter of *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 95 (1943), but is ultimately not a problem.  *Chenery* held that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *Id.*  But the Court was clear that it was not disturbing "the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason." *Id.* at 88 (quotation omitted).  Instead, the *Chenery* principle applies where "an order is valid only as a determination of

No. 20-60051

NDAA is not adequately clear for any such waiver to be effective. In so holding, we join the two other federal courts that have directly addressed the question.[15]

1.

A state's waiver of sovereign immunity "must be knowing and voluntary."[16] Where the waiver is effected by accepting federal funds conditioned on waiver, the "knowing" and "voluntary" requirements align with two of the requirements for all conditions placed on federal money: "[A]ny condition on the receipt of federal funds must be unambiguous . . . [and] the grant and its conditions cannot amount to coercion as opposed to encouragement." *Gruver*, 959 F.3d at 182 (citing *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987)). Where those constraints on Congress's spending power are met, the requirements for an effective waiver are also satisfied. *See id.*

The "voluntary" requirement is usually, but not always, met where the "knowing" requirement is. *Pace*, 403 F.3d at 279. Neither party contends that the NDAA's condition would be coercive, so we express no opinion on the matter and focus our analysis on the "knowing" requirement.

The "knowing" requirement is a "stringent clear-statement rule . . . ." *Id.*[17] That is because for Spending Clause analysis, "the key is not

---

policy or judgment which the agency alone is authorized to make . . . ." *Id.* Whether sovereign immunity bars the action is not such a determination, so the DOE theoretically can prevail on its new reasoning despite *Chenery*.

[15] *See Williams v. Morgan State Univ.*, No. GLR-19-5, 2019 WL 4752778, at *6 (D. Md. Sept. 30, 2019), *appeal filed*, No. 19-2477 (Dec. 27, 2019); *Slack v. Washington Metro. Area Transit Auth.*, 353 F. Supp. 3d 1, 11–12 (D.D.C. 2019).

[16] *Gruver*, 959 F.3d at 182 (citing *Pace*, 403 F.3d at 277–78); *see also Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999).

[17] *See also Edelman v. Jordan*, 415 U.S. 651, 673 (1974) ("[W]e will find waiver only where stated by the most express language or by such overwhelming implications from the

[Congressional intent] but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). The statute need not include a "talismanic incantation[] of the magic words" "'waiver' or 'condition,'" but it must be "unambiguous . . . ." *Pace*, 403 F.3d at 281–82. Furthermore, "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to" overcome sovereign immunity. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). Instead, the statute must "manifest[] a clear intent to condition" the funding "on a State's consent to waive its constitutional immunity." *Id.* at 247.

The DOE asserts that the NDAA unambiguously put the TEA on notice that it would be subject to the remedial scheme of § 4712, including the possibility of damages, should the TEA choose to accept federal funds through any grant, including the IDEA. The TEA counters that the NDAA is inadequately clear because the "statutory text makes no reference to 'states' or to 'immunity.'" Further, the TEA points out the breadth of the DOE's interpretation, which would mean "that the NDAA—solely by referencing 'contractor' and 'grantee'—acts as a *global* waiver of sovereign immunity for *any* State that enters into *any* contract with or receives *any* grant from the federal government." The breadth of the waiver that interpretation invokes, they posit, belies the possibility that the waiver would be knowing.

The TEA is correct. The NDAA lacks the clarity required for a knowing waiver under our and Supreme Court caselaw. Comparing the NDAA to other statutes that we have held are and are not sufficiently clear elucidates

---

text as will leave no room for any other reasonable construction."(cleaned up)).

this.  We have held that the IDEA[18] and Title IX[19] unambiguously conditioned a federal grant on states' waiving their immunity.  Both cases relied on statutory language expressly mentioning sovereign immunity.  For example, in *Pederson*, we held that the language, "'a State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of title IX of the Education Amendments of 1972' . . . . clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment Immunity."  *Pederson*, 213 F.3d at 875–76 (quoting 42 U.S.C. § 2000d-7(a)(1)) (cleaned up).  We held that using the word "waiver" or "condition" was unnecessary where the statute so plainly contemplated states' being sued for violations related to the grant.  *Id.* at 876.  In *Pace*, 403 F.3d at 281–82, we applied that reasoning to the IDEA.[20]

Conversely, we have held that statutes lacking an explicit reference to sovereign immunity are not sufficiently clear.  For example, the Rehabilitation Act says "Any party aggrieved by a final decision described in subparagraph (I), may bring a civil action for review of such decision.  The action may be brought in any state court of competent jurisdiction or in a district court of the United States of competent jurisdiction . . . ."  29 U.S.C. § 722(c)-(5)(J)(i).  In *Hurst v. Texas Department of Assistive & Rehabilitative Services*, 482 F.3d 809, 810–14 (5th Cir. 2007), we held that language did not constitute waiver, based on the holding in *Atascadero* that general authorizations for

---

[18] *Pace*, 403 F.3d at 285.

[19] *Pederson v. La. State Univ.*, 213 F.3d 858, 876 (5th Cir. 2000).

[20] The relevant IDEA provision reads, "A State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."  20 U.S.C. § 1403(a).

No. 20-60051

suit in federal court are insufficiently clear.[21]

The NDAA is much more like the Rehabilitation Act than like the IDEA or Title IX. The NDAA does not mention states, leaving it ambiguous whether it applies to them.[22] And other whistleblower retaliation provisions, such as the provision in the American Recovery and Reinvestment Act,[23] do, demonstrating that Congress knows how to make such provisions' application to states clear. Moreover, the NDAA makes no mention of sovereign immunity or the Eleventh Amendment. Though we have not required the "talismanic incantations of [the] magic words," "waiver" or "condition," the caselaw shows that we have tended to require that the statute at least mention immunity.[24] The NDAA does not, and therefore the TEA did not knowingly waive immunity. Finally, the sheer breadth of the opposite holding—that states must forgo every dollar of federal funding or else waive

---

[21] Importantly, *Hurst* distinguished the Rehabilitation Act from the Telecommunications Act, which similarly provided that "any party aggrieved by [a State Commission's] determination may bring an action in an appropriate Federal district court . . . ." 47 U.S.C. § 252(e)(6). In *AT&T Commc'ns v. BellSouth Telecomms., Inc.*, 238 F.3d 636, 646–47 (5th Cir. 2001), we held that *was* sufficiently clear. But *AT&T* was not a Spending Clause case. Instead, the waiver was conditioned on allowing states to regulate in an otherwise federally preempted field. *See Hurst*, 482 F.3d at 813. *Hurst* distinguished that comprehensive federal regulatory scheme from more typical waiver cases in which states could "offer similar services with or without participation in the federal program." *Id.* at 814. Because the present case does not involve a federally preempted field, *Hurst*, not *AT&T*, is the relevant comparison.

[22] Because the TEA has not contended that the NDAA does not, by its terms, apply to it, we express no opinion on that.

[23] Pub. L. No. 111-5, § 1553, 123 Stat. 115, 297–302 (2009).

[24] *Compare Pace*, 403 F.3d at 281 (finding waiver for a statute that mentioned immunity), *and Pederson*, 213 F.3d at 876 (same), *with Hurst*, 482 F.3d at 810–14 (finding no waiver for a statute that did not mention immunity). To be clear, there is no rule that a statute *must* mention immunity to be sufficiently pellucid; instead, it is an important factor, which here demonstrates the NDAA is insufficiently clear.

immunity—is reason to be skeptical that states knowingly made that choice.

2.

The DOE does not rest its waiver argument solely on the text of the NDAA.  It also contends that regulations clarify what the statute may have left ambiguous, thereby making the state's waiver knowing and voluntary. Specifically, 2 C.F.R. § 200.300(b) (2020) clarifies that "the non-Federal entity is responsible for complying with all requirements of the Federal award. . . .  See also statutory requirements for whistleblower protections [including the NDAA]."  "Non-Federal entity" is defined to include state governments.  *Id.* § 200.69.  And that regulation applies to Department of Education grantees.  *Id.* § 3474.1.

A question of first impression is whether the clarity required for a waiver of sovereign immunity to be "knowing" can be met by regulations clarifying an ambiguous statute.  The needed clarity cannot be so provided— it must come directly from the statute, for two reasons.

First, when Congress places conditions on "the States' receipt of federal funds, it 'must do so unambiguously . . . .'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Regulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of *Dole*.  Given *Gruver*'s acknowledgment that *Dole*'s unambiguity condition overlaps with *College Saving Bank*'s "knowing" requirement, it would be odd if the regulation could

be satisfactory for one but not the other.[25]

Second, the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare. The Constitution carefully separates the "purse" from the "sword" by assigning to Congress and Congress alone the power of the purse. THE FEDERALIST NOS. 78 (Alexander Hamilton), 58 (James Madison). Allowing the Executive to require states to waive immunity to receive federal funds would grant the Executive a power of the purse and thus would be inconsistent with the Constitution's meticulous separation of powers. Therefore, regulations cannot provide the clarity needed to render the state's waiver of sovereign immunity knowing.

The petition for review is GRANTED. The order granting relief to Kash is VACATED; this proceeding is REMANDED to the agency with direction to dismiss the proceedings without delay.[26]

---

[25] *See also Slack*, 353 F. Supp. 3d at 11 (holding Congress itself must condition receipt of federal funds on waiving sovereign immunity).

[26] Because sovereign immunity barred the proceedings against the TEA, we express no opinion on whether the DOE's decision was arbitrary and capricious, without jurisdiction because the statutory deadline had passed, unlawfully delegated, or violative of due process.