(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALLEN ET AL. *v.* COOPER, GOVERNOR OF NORTH CAROLINA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 18–877. Argued November 5, 2019—Decided March 23, 2020

In 1996, a marine salvage company named Intersal, Inc., discovered the shipwreck of the *Queen Anne's Revenge* off the North Carolina coast. North Carolina, the shipwreck's legal owner, contracted with Intersal to conduct recovery operations. Intersal, in turn, hired videographer Frederick Allen to document the efforts. Allen recorded videos and took photos of the recovery for more than a decade. He registered copyrights in all of his works. When North Carolina published some of Allen's videos and photos online, Allen sued for copyright infringement. North Carolina moved to dismiss the lawsuit on the ground of state sovereign immunity. Allen countered that the Copyright Remedy Clarification Act of 1990 (CRCA) removed the States' sovereign immunity in copyright infringement cases. The District Court agreed with Allen, finding in the CRCA's text a clear congressional intent to abrogate state sovereign immunity and a proper constitutional basis for that abrogation. The court acknowledged that *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, precluded Congress from using its Article I powers—including its authority over copyrights—to deprive States of sovereign immunity. But the court held that Congress could accomplish its objective under Section 5 of the Fourteenth Amendment. The Fourth Circuit reversed, reading *Florida Prepaid* to prevent recourse to both Article I and Section 5.

*Held*: Congress lacked authority to abrogate the States' immunity from copyright infringement suits in the CRCA. Pp. 4–17.

  (a) In general, a federal court may not hear a suit brought by any person against a nonconsenting State. But such suits are permitted if Congress has enacted "unequivocal statutory language" abrogating

the States' immunity from suit, *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 56, and some constitutional provision allows Congress to have thus encroached on the States' sovereignty. Congress used clear language to abrogate the States' immunity from copyright infringement suits in the CRCA. Allen contends that Congress's constitutional power to do so arises either from the Intellectual Property Clause, Art. I, §8, cl. 8, or from Section 5 of the Fourteenth Amendment, which authorizes Congress to "enforce" the commands of the Due Process Clause. Each contention is foreclosed by precedent. Pp. 4–6.

(b) The Intellectual Property Clause enables Congress to grant both copyrights and patents. In Allen's view, Congress's authority to abrogate sovereign immunity from copyright suits naturally follows, in order to "secur[e]" a copyright holder's "exclusive Right" as against a State's intrusion. But that theory was rejected in *Florida Prepaid*. That case considered the constitutionality of the Patent Remedy Act, which, like the CRCA, attempted to put "States on the same footing as private parties" in patent infringement lawsuits. 527 U. S., at 647, 648. *Florida Prepaid* acknowledged that Congress's goal of providing uniform remedies in infringement cases was a "proper Article I concern," but held that *Seminole Tribe* precluded Congress from using its Article I powers "to circumvent" the limits sovereign immunity "place[s] upon federal jurisdiction," 517 U. S., at 73. For the same reason, Article I cannot support the CRCA. Allen reads *Central Va. Community College* v. *Katz,* 546 U. S. 356 to have replaced *Seminole Tribe*'s general rule with a clause-by-clause approach to evaluating whether a particular constitutional provision allows the abrogation of sovereign immunity. But *Katz* rested on the unique history of the Bankruptcy Clause. 546 U. S., at 369, n. 9. And even if the limits of *Katz*'s holding were not so clear, *Florida Prepaid*, together with *stare decisis*, would doom Allen's argument. Overruling *Florida Prepaid* would require a "special justification," over and above the belief "that the precedent was wrongly decided," *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. 258, 266, which Allen does not offer. Pp. 6–10.

(c) Section 5 of the Fourteenth Amendment allows Congress to abrogate the States' immunity as part of its power "to enforce" the Amendment's substantive prohibitions. *City of Boerne* v. *Flores*, 521 U. S. 507, 519. For Congress's action to fall within its Section 5 authority, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, at 520. This test requires courts to consider the nature and extent of state conduct violating the Fourteenth Amendment and to examine the scope of Congress's response to that injury. *Florida Prepaid* again serves as the critical precedent. There, the Court defined

the scope of unconstitutional patent infringement as intentional conduct for which there is no adequate state remedy. 527 U. S., at 642–643, 645. Because Congress failed to identify a pattern of unconstitutional patent infringement when it enacted the Patent Remedy Act, the Court held that the Act swept too far. Given the identical scope of the CRCA and Patent Remedy Act, this case could be decided differently only if the CRCA responded to materially stronger evidence of unconstitutional infringement. But as in *Florida Prepaid*, the legislative record contains thin evidence of infringement. Because this record cannot support Congress's choice to strip the States of their sovereign immunity in all copyright infringement cases, the CRCA fails the "congruence and proportionality" test. Pp. 10–16.

895 F. 3d 337, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, GORSUCH, and KAVANAUGH, JJ., joined, and in which THOMAS, J., joined except for the final paragraph in Part II–A and the final paragraph in Part II–B. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–877

_____

## FREDERICK L. ALLEN, ET AL., PETITIONERS *v.* ROY A. COOPER, III, GOVERNOR OF NORTH CAROLINA, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 23, 2020]

JUSTICE KAGAN delivered the opinion of the Court.

In two basically identical statutes passed in the early 1990s, Congress sought to strip the States of their sovereign immunity from patent and copyright infringement suits. Not long after, this Court held in *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999), that the patent statute lacked a valid constitutional basis. Today, we take up the copyright statute. We find that our decision in *Florida Prepaid* compels the same conclusion.

I

In 1717, the pirate Edward Teach, better known as Blackbeard, captured a French slave ship in the West Indies and renamed her *Queen Anne's Revenge.* The vessel became his flagship. Carrying some 40 cannons and 300 men, the *Revenge* took many prizes as she sailed around the Caribbean and up the North American coast. But her reign over those seas was short-lived. In 1718, the ship ran aground on a sandbar a mile off Beaufort, North Carolina. Blackbeard and most of his crew escaped without harm.

Not so the *Revenge*. She sank beneath the waters, where she lay undisturbed for nearly 300 years.

In 1996, a marine salvage company named Intersal, Inc., discovered the shipwreck. Under federal and state law, the wreck belongs to North Carolina. See 102 Stat. 433, 43 U. S. C. §2105(c); N. C. Gen. Stat. Ann. §121–22 (2019). But the State contracted with Intersal to take charge of the recovery activities. Intersal in turn retained petitioner Frederick Allen, a local videographer, to document the operation. For over a decade, Allen created videos and photos of divers' efforts to salvage the *Revenge*'s guns, anchors, and other remains. He registered copyrights in all those works.

This suit arises from North Carolina's publication of some of Allen's videos and photos. Allen first protested in 2013 that the State was infringing his copyrights by uploading his work to its website without permission. To address that allegation, North Carolina agreed to a settlement paying Allen $15,000 and laying out the parties' respective rights to the materials. But Allen and the State soon found themselves embroiled in another dispute. Allen complained that North Carolina had impermissibly posted five of his videos online and used one of his photos in a newsletter. When the State declined to admit wrongdoing, Allen filed this action in Federal District Court. It charges the State with copyright infringement (call it a modern form of piracy) and seeks money damages.

North Carolina moved to dismiss the suit on the ground of sovereign immunity. It invoked the general rule that federal courts cannot hear suits brought by individuals against nonconsenting States. See State Defendants' Memorandum in No. 15–627 (EDNC), Doc. 50, p. 7. But Allen responded that an exception to the rule applied because Congress had abrogated the States' sovereign immunity from suits like his. See Plaintiffs' Response, Doc. 57, p. 7. The Copyright Remedy Clarification Act of 1990 (CRCA or Act)

provides that a State "shall not be immune, under the Eleventh Amendment [or] any other doctrine of sovereign immunity, from suit in Federal court" for copyright infringement. 17 U. S. C. §511(a). And the Act specifies that in such a suit a State will be liable, and subject to remedies, "in the same manner and to the same extent as" a private party. §501(a); see §511(b).[1] That meant, Allen contended, that his suit against North Carolina could go forward.

The District Court agreed. Quoting the CRCA's text, the court first found that "Congress has stated clearly its intent to abrogate sovereign immunity for copyright claims against a state." 244 F. Supp. 3d 525, 533 (EDNC 2017). And that abrogation, the court next held, had a proper constitutional basis. *Florida Prepaid* and other precedent, the District Court acknowledged, precluded Congress from using its Article I powers—including its authority over copyrights—to take away a State's sovereign immunity. See 244 F. Supp. 3d, at 534. But in the court's view, *Florida Prepaid* left open an alternative route to abrogation. Given the States' "pattern" of "abus[ive]" copyright infringement, the court held, Congress could accomplish its object under Section 5 of the Fourteenth Amendment. 244 F. Supp. 3d, at 535.

On interlocutory appeal, the Court of Appeals for the Fourth Circuit reversed. It read *Florida Prepaid* to prevent recourse to Section 5 no less than to Article I. A Section 5 abrogation, the Fourth Circuit explained, must be "congruent and proportional" to the Fourteenth Amendment injury

——————
[1] The CRCA served as the model for the Patent and Plant Variety Protection Clarification Act (Patent Remedy Act), passed two years later (and repudiated by this Court in *Florida Prepaid*, see *supra,* at 1). Using the same language, the latter statute provided that a State "shall not be immune, under the [E]leventh [A]mendment [or] any other doctrine of sovereign immunity, from suit in Federal court" for patent infringement. §2, 106 Stat. 4230. And so too, the statute specified that in such a suit, a State will be liable, and subject to remedies, "in the same manner and to the same extent as" a private party. *Ibid.*

it seeks to remedy.  895 F. 3d 337, 350 (2018).  *Florida Prepaid* had applied that principle to reject Congress's attempt, in the Patent Remedy Act, to abolish the States' immunity from patent infringement suits.  See 527 U. S., at 630.  In the Fourth Circuit's view, nothing distinguished the CRCA.  That abrogation, the court reasoned, was "equally broad" and rested on a "similar legislative record" of constitutional harm.  895 F. 3d, at 352.  So Section 5 could not save the law.

Because the Court of Appeals held a federal statute invalid, this Court granted certiorari.  587 U. S. ___ (2019).  We now affirm.

## II

In our constitutional scheme, a federal court generally may not hear a suit brought by any person against a nonconsenting State.  That bar is nowhere explicitly set out in the Constitution.  The text of the Eleventh Amendment (the single most relevant provision) applies only if the plaintiff is not a citizen of the defendant State.[2]  But this Court has long understood that Amendment to "stand not so much for what it says" as for the broader "presupposition of our constitutional structure which it confirms."  *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991).  That premise, the Court has explained, has several parts.  First, "each State is a sovereign entity in our federal system." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 54 (1996). Next, "[i]t is inherent in the nature of sovereignty not to be amenable to [a] suit" absent consent.  *Id.,* at 54, n. 13  (quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton)).  And last, that fundamental aspect of sovereignty constrains federal "judicial authority."  *Blatchford*,

---

[2] The Eleventh Amendment reads: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

501 U. S., at 779.

But not entirely. This Court has permitted a federal court to entertain a suit against a nonconsenting State on two conditions. First, Congress must have enacted "unequivocal statutory language" abrogating the States' immunity from the suit. *Seminole Tribe*, 517 U. S., at 56 (internal quotation marks omitted); see *Dellmuth* v. *Muth*, 491 U. S. 223, 228 (1989) (requiring Congress to "mak[e] its intention unmistakably clear"). And second, some constitutional provision must allow Congress to have thus encroached on the States' sovereignty. Not even the most crystalline abrogation can take effect unless it is "a valid exercise of constitutional authority." *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 78 (2000).

No one here disputes that Congress used clear enough language to abrogate the States' immunity from copyright infringement suits. As described above, the CRCA provides that States "shall not be immune" from those actions in federal court. §511(a); see *supra,* at 2–3. And the Act specifies that a State stands in the identical position as a private defendant—exposed to liability and remedies "in the same manner and to the same extent." §501(a); see §511(b). So there is no doubt what Congress meant to accomplish. Indeed, this Court held in *Florida Prepaid* that the essentially verbatim provisions of the Patent Remedy Act "could not have [made] any clearer" Congress's intent to remove the States' immunity. 527 U. S., at 635.

The contested question is whether Congress had authority to take that step. Allen maintains that it did, under either of two constitutional provisions. He first points to the clause in Article I empowering Congress to provide copyright protection. If that fails, he invokes Section 5 of the Fourteenth Amendment, which authorizes Congress to "enforce" the commands of the Due Process Clause. Neither contention can succeed. The slate on which we write today is anything but clean. *Florida Prepaid*, along with other

precedent, forecloses each of Allen's arguments.

A

Congress has power under Article I "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." §8, cl. 8. That provision—call it the Intellectual Property Clause—enables Congress to grant both copyrights and patents. And the monopoly rights so given impose a corresponding duty (*i.e.,* not to infringe) on States no less than private parties. See *Goldstein* v. *California*, 412 U. S. 546, 560 (1973).

In Allen's view, Congress's authority to abrogate sovereign immunity from copyright suits naturally follows. Abrogation is the single best—or maybe, he says, the only—way for Congress to "secur[e]" a copyright holder's "exclusive Right[s]" as against a State's intrusion. See Brief for Petitioners 20 (quoting Art. I, §8, cl. 8). So, Allen contends, the authority to take that step must fall within the Article I grant of power to protect intellectual property.

The problem for Allen is that this Court has already rejected his theory. The Intellectual Property Clause, as just noted, covers copyrights and patents alike. So it was the first place the *Florida Prepaid* Court looked when deciding whether the Patent Remedy Act validly stripped the States of immunity from infringement suits. In doing so, we acknowledged the reason for Congress to put "States on the same footing as private parties" in patent litigation. 527 U. S., at 647. It was, just as Allen says here, to ensure "uniform, surefire protection" of intellectual property. Reply Brief 10. That was a "proper Article I concern," we allowed. 527 U. S., at 648. But still, we said, Congress could not use its Article I power over patents to remove the States' immunity. We based that conclusion on *Seminole Tribe* v. *Florida*, decided three years earlier. There, the Court had held that "Article I cannot be used to circumvent" the limits

sovereign immunity "place[s] upon federal jurisdiction." 517 U. S., at 73. That proscription ended the matter. Because Congress could not "abrogate state sovereign immunity [under] Article I," *Florida Prepaid* explained, the Intellectual Property Clause could not support the Patent Remedy Act. 527 U. S., at 636. And to extend the point to this case: if not the Patent Remedy Act, not its copyright equivalent either, and for the same reason. Here too, the power to "secur[e]" an intellectual property owner's "exclusive Right" under Article I stops when it runs into sovereign immunity. §8, cl. 8.

Allen claims, however, that a later case offers an exit ramp from *Florida Prepaid*. In *Central Va. Community College* v. *Katz*, 546 U. S. 356, 359 (2006), we held that Article I's Bankruptcy Clause enables Congress to subject nonconsenting States to bankruptcy proceedings (there, to recover a preferential transfer). We thus exempted the Bankruptcy Clause from *Seminole Tribe*'s general rule that Article I cannot justify haling a State into federal court. In bankruptcy, we decided, sovereign immunity has no place. But if that is true, Allen asks, why not say the same thing here? Allen reads *Katz* as "adopt[ing] a clause-by-clause approach to evaluating whether a particular clause of Article I" allows the abrogation of sovereign immunity. Brief for Petitioners 20. And he claims that the Intellectual Property Clause "supplies singular warrant" for Congress to take that step. *Ibid.* That is so, Allen reiterates, because "Congress could not 'secur[e]' authors' 'exclusive Right' to their works if [it] were powerless" to make States pay for infringing conduct. *Ibid.*

But everything in *Katz* is about and limited to the Bankruptcy Clause; the opinion reflects what might be called bankruptcy exceptionalism. In part, *Katz* rested on the "singular nature" of bankruptcy jurisdiction. 546 U. S., at 369, n. 9. That jurisdiction is, and was at the Founding, "principally *in rem*"—meaning that it is "premised on the

debtor and his estate, and not on the creditors" (including a State). *Id.,* at 369–370 (internal quotation marks omitted). For that reason, we thought, "it does not implicate States' sovereignty to nearly the same degree as other kinds of jurisdiction." *Id.,* at 362. In remaining part, *Katz* focused on the Bankruptcy Clause's "unique history." *Id.,* at 369, n. 9. The Clause emerged from a felt need to curb the States' authority. The States, we explained, "had wildly divergent schemes" for discharging debt, and often "refus[ed] to respect one another's discharge orders." *Id.,* at 365, 377. "[T]he Framers' primary goal" in adopting the Clause was to address that problem—to stop "competing sovereigns[]" from interfering with a debtor's discharge. *Id.,* at 373. And in that project, the Framers intended federal courts to play a leading role. The nation's first Bankruptcy Act, for example, empowered those courts to order that States release people they were holding in debtors' prisons. See *id.,* at 374. So through and through, we thought, the Bankruptcy Clause embraced the idea that federal courts could impose on state sovereignty. In that, it was *sui generis*—again, "unique"—among Article I's grants of authority. *Id.,* at 369, n. 9.

Indeed, *Katz*'s view of the Bankruptcy Clause had a yet more striking aspect, which further separates it from any other. The Court might have concluded from its analysis that the Clause allows Congress to abrogate the States' sovereign immunity (as Allen argues the Intellectual Property Clause does). But it did not; it instead went further. Relying on the above account of the Framers' intentions, the Court found that *the Bankruptcy Clause itself* did the abrogating. *Id.,* at 379 ("[T]he relevant 'abrogation' is the one effected in the plan of the [Constitutional] Convention"). Or stated another way, we decided that no congressional abrogation was needed because the States had already "agreed in the plan of the Convention not to assert any sovereign immunity defense" in bankruptcy proceedings. *Id.,* at 377.

We therefore discarded our usual rule—which Allen accepts as applying here—that *Congress* must speak, and indeed speak unequivocally, to abrogate sovereign immunity. Compare *id.,* at 378–379 ("[O]ur decision today" does not "rest[] on any statement Congress ha[s] made on the subject of state sovereign immunity"), with *supra,* at 5 (our ordinary rule). Our decision, in short, viewed bankruptcy as on a different plane, governed by principles all its own. Nothing in that understanding invites the kind of general, "clause-by-clause" reexamination of Article I that Allen proposes. See *supra,* at 7. To the contrary, it points to a good-for-one-clause-only holding.

And even if *Katz*'s confines were not so clear, *Florida Prepaid*, together with *stare decisis*, would still doom Allen's argument. As Allen recognizes, if the Intellectual Property Clause permits the CRCA's abrogation, it also would permit the Patent Remedy Act's. See Tr. of Oral Arg. 9 (predicting that if his position prevailed, "ultimately, the Patent Remedy Act would be revisited and properly upheld as a valid exercise of Congress's Article I power"). Again, there is no difference between copyrights and patents under the Clause, nor any material difference between the two statutes' provisions. See *supra,* at 3, and n. 1, 6. So we would have to overrule *Florida Prepaid* if we were to decide this case Allen's way. But *stare decisis*, this Court has understood, is a "foundation stone of the rule of law." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 798 (2014). To reverse a decision, we demand a "special justification," over and above the belief "that the precedent was wrongly decided." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. 258, 266 (2014). Allen offers us nothing special at all; he contends only that if the Court were to use a clause-by-clause approach, it would discover that *Florida Prepaid* was wrong (because, he says again, the decision misjudged Congress's authority under the Intellectual Property Clause). See Brief for Petitioners 37; *supra,* at 6–7. And with that

charge of error alone, Allen cannot overcome *stare decisis*.

## B

Section 5 of the Fourteenth Amendment, unlike almost all of Article I, can authorize Congress to strip the States of immunity. The Fourteenth Amendment "fundamentally altered the balance of state and federal power" that the original Constitution and the Eleventh Amendment struck. *Seminole Tribe*, 517 U. S., at 59. Its first section imposes prohibitions on the States, including (as relevant here) that none may "deprive any person of life, liberty, or property, without due process of law." Section 5 then gives Congress the "power to enforce, by appropriate legislation," those limitations on the States' authority. That power, the Court has long held, may enable Congress to abrogate the States' immunity and thus subject them to suit in federal court. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976).

For an abrogation statute to be "appropriate" under Section 5, it must be tailored to "remedy or prevent" conduct infringing the Fourteenth Amendment's substantive prohibitions. *City of Boerne* v. *Flores*, 521 U. S. 507, 519 (1997). Congress can permit suits against States for actual violations of the rights guaranteed in Section 1. See *Fitzpatrick*, 427 U. S., at 456. And to deter those violations, it can allow suits against States for "a somewhat broader swath of conduct," including acts constitutional in themselves. *Kimel*, 528 U. S., at 81. But Congress cannot use its "power to enforce" the Fourteenth Amendment to alter what that Amendment bars. See *id.,* at 88 (prohibiting Congress from "substantively redefin[ing]" the Fourteenth Amendment's requirements). That means a congressional abrogation is valid under Section 5 only if it sufficiently connects to conduct courts have held Section 1 to proscribe.

To decide whether a law passes muster, this Court has framed a type of means-end test. For Congress's action to fall within its Section 5 authority, we have said, "[t]here

must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Boerne*, 521 U. S., at 520. On the one hand, courts are to consider the constitutional problem Congress faced—both the nature and the extent of state conduct violating the Fourteenth Amendment. That assessment usually (though not inevitably) focuses on the legislative record, which shows the evidence Congress had before it of a constitutional wrong. See *Florida Prepaid*, 527 U. S., at 646. On the other hand, courts are to examine the scope of the response Congress chose to address that injury. Here, a critical question is how far, and for what reasons, Congress has gone beyond redressing actual constitutional violations. Hard problems often require forceful responses and, as noted above, Section 5 allows Congress to "enact[] reasonably prophylactic legislation" to deter constitutional harm. *Kimel,* 528 U. S., at 88; *Boerne*, 521 U. S., at 536 (Congress's conclusions on that score are "entitled to much deference"); *supra,* at 10. But "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Boerne*, 521 U. S., at 530. Always, what Congress has done must be in keeping with the Fourteenth Amendment rules it has the power to "enforce."

All this raises the question: When does the Fourteenth Amendment care about copyright infringement? Sometimes, no doubt. Copyrights are a form of property. See *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 128 (1932). And the Fourteenth Amendment bars the States from "depriv[ing]" a person of property "without due process of law." But even if sometimes, by no means always. Under our precedent, a merely negligent act does not "deprive" a person of property. See *Daniels* v. *Williams*, 474 U. S. 327, 328 (1986). So an infringement must be intentional, or at least reckless, to come within the reach of the Due Process Clause. See *id.,* at 334, n. 3 (reserving whether reckless conduct suffices). And more: A State cannot violate that Clause unless it fails

to offer an adequate remedy for an infringement, because such a remedy itself satisfies the demand of "due process." See *Hudson* v. *Palmer*, 468 U. S. 517, 533 (1984). That means within the broader world of state copyright infringement is a smaller one where the Due Process Clause comes into play.

Because the same is true of patent infringement, *Florida Prepaid* again serves as the critical precedent. That decision defined the scope of unconstitutional infringement in line with the caselaw cited above—as intentional conduct for which there is no adequate state remedy. See 527 U. S*.,* at 642–643, 645. It then searched for evidence of that sort of infringement in the legislative record of the Patent Remedy Act. And it determined that the statute's abrogation of immunity—again, the equivalent of the CRCA's—was out of all proportion to what it found. That analysis is the starting point of our inquiry here. And indeed, it must be the ending point too unless the evidence of unconstitutional infringement is materially different for copyrights than patents. Consider once more, then, *Florida Prepaid*, now not on Article I but on Section 5.

In enacting the Patent Remedy Act, *Florida Prepaid* found, Congress did not identify a pattern of unconstitutional patent infringement. To begin with, we explained, there was only thin evidence of States infringing patents at all—putting aside whether those actions violated due process. The House Report, recognizing that "many states comply with patent law," offered just two examples of patent infringement suits against the States. *Id.,* at 640 (quoting H. R. Rep. No. 101–960, pt. 1, p. 38 (1990)). The appellate court below, boasting some greater research prowess, discovered another seven in the century-plus between 1880 and 1990. See 527 U. S., at 640. Even the bill's House sponsor conceded the lack of "any evidence" of "widespread violation of patent laws." *Id.,* at 641 (quoting statement of Rep. Kastenmeier). What was more, there was no

evidence that any instance of infringement by States crossed constitutional lines. Congress, we observed, "did not focus" on intentional or reckless conduct; to the contrary, the legislative record suggested that "most state infringement was innocent or at worst negligent." *Id.,* at 645. And similarly, Congress "barely considered the availability of state remedies for patent infringement." *Id.,* at 643. So, we concluded, nothing could support the idea that States were more than sporadically (if that) "depriving patent owners of property without due process of law." *Id.,* at 646.

Given that absence of evidence, *Florida Prepaid* held, the Patent Remedy Act swept too far. Recall what the Patent Remedy Act did—and did not. It abrogated sovereign immunity for any and every patent suit, thereby "plac[ing] States on the same footing as private parties." *Id.,* at 647. It did not set any limits. It did not, for example, confine the abrogation to suits alleging "nonnegligent infringement or infringement authorized [by] state policy." *Ibid.* Neither did it target States refusing to offer alternative remedies to patent holders. No, it exposed all States to the hilt—on a record that failed to show they had caused any discernible constitutional harm (or, indeed, much harm at all). That imbalance made it impossible to view the legislation "as responsive to, or designed to prevent, unconstitutional behavior." *Id.,* at 646 (quoting *Boerne,* 521 U. S., at 532). The statute's "indiscriminate scope" was too "out of proportion" to any due process problem. 527 U. S*.,* at 646–647. It aimed not to correct such a problem, but to "provide a uniform remedy for patent infringement" writ large. *Id.,* at 647. The Patent Remedy Act, in short, did not "enforce" Section 1 of the Fourteenth Amendment—and so was not "appropriate" under Section 5.

Could, then, this case come out differently? Given the identical scope of the CRCA and Patent Remedy Act, that could happen only if the former law responded to materially

stronger evidence of infringement, especially of the uncon-
stitutional kind. Allen points to a significant disparity in
how Congress created a record for the two statutes. See
Brief for Petitioners 7–10, 47–50. Before enacting the
CRCA, Congress asked the then-Register of Copyrights,
Ralph Oman, to submit a report about the effects of the
Eleventh Amendment on copyright enforcement. Oman
and his staff conducted a year-long examination, which in-
cluded a request for public comments eliciting letters from
about 40 copyright holders and industry groups. The final
158-page report concluded that "copyright proprietors have
demonstrated they will suffer immediate harm if they are
unable to sue infringing states in federal court." Copyright
Office, Copyright Liability of States and the Eleventh
Amendment 103 (1988) (Oman Report). Is that report
enough, as Allen claims, to flip *Florida Prepaid*'s outcome
when it comes to copyright cases against the States?

It is not. Behind the headline-grabbing conclusion, noth-
ing in the Oman Report, or the rest of the legislative record,
cures the problems we identified in *Florida Prepaid*. As an
initial matter, the concrete evidence of States infringing
copyrights (even ignoring whether those acts violate due
process) is scarcely more impressive than what the *Florida
Prepaid* Court saw. Despite undertaking an exhaustive
search, Oman came up with only a dozen possible examples
of state infringement. He listed seven court cases brought
against States (with another two dismissed on the merits)
and five anecdotes taken from public comments (but not
further corroborated). See Oman Report, at 7–9, 90–97. In
testifying about the report, Oman acknowledged that state
infringement is "not widespread" and "the States are not
going to get involved in wholesale violation of the copyright
laws." Hearings on H. R. 1131 before the Subcommittee on
Courts, Intellectual Property, and the Administration of
Justice, 101st Cong., 1st Sess., 53 (1989) (House Hearings).
Indeed, he opined: "They are all respectful of the copyright

law" and "will continue to respect the law"; what State, af-
ter all, would "want[] to get a reputation as a copyright pi-
rate?" *Id.,* at 8. The bill's House and Senate sponsors got
the point. The former admitted that "there have not been
any significant number" of copyright violations by States.
*Id.,* at 48 (Rep. Kastenmeier). And the latter conceded he
could not currently see "a big problem." Hearings on S. 497
before the Subcommittee on Patents, Copyrights and
Trademarks, 101st Cong., 1st Sess., 130 (1989) (Sen.
DeConcini). This is not, to put the matter charitably, the
stuff from which Section 5 legislation ordinarily arises.

And it gets only worse. Neither the Oman Report nor any
other part of the legislative record shows concern with
whether the States' copyright infringements (however few
and far between) violated the Due Process Clause. Of the
12 infringements listed in the report, only two appear in-
tentional, as they must be to raise a constitutional issue.
See Oman Report, at 7–8, 91 (describing a judicial finding
of "willful" infringement and a public comment charging
continued infringement after a copyright owner com-
plained). As Oman testified, the far greater problem was
the frequency of "honest mistakes" or "innocent" misunder-
standings; the benefit of the bill, he therefore thought,
would be to "guard against sloppiness." House Hearings*,*
at 9. Likewise, the legislative record contains no informa-
tion about the availability of state-law remedies for copyright
infringement (such as contract or unjust enrichment
suits)—even though they might themselves satisfy due pro-
cess. Those deficiencies in the record match the ones *Flor-
ida Prepaid* emphasized. See 527 U. S., at 643–645. Here
no less than there, they signal an absence of constitutional
harm.

Under *Florida Prepaid*, the CRCA thus must fail our
"congruence and proportionality" test. *Boerne*, 521 U. S., at
520. As just shown, the evidence of Fourteenth Amendment
injury supporting the CRCA and the Patent Remedy Act is

equivalent—for both, that is, exceedingly slight.  And the
scope of the two statutes is identical—extending to every
infringement case against a State.  It follows that the bal-
ance the laws strike between constitutional wrong and stat-
utory remedy is correspondingly askew.  In this case, as in
*Florida Prepaid*, the law's "indiscriminate scope" is "out of
proportion" to any due process problem.  527 U. S., at 646–
647; see *supra,* at 13.  In this case, as in that one, the statute
aims to "provide a uniform remedy" for statutory infringe-
ment, rather than to redress or prevent unconstitutional
conduct.  527 U. S., at 647; see *supra,* at 13.  And so in this
case, as in that one, the law is invalid under Section 5.

That conclusion, however, need not prevent Congress
from passing a valid copyright abrogation law in the future.
In doing so, Congress would presumably approach the issue
differently than when it passed the CRCA.  At that time,
the Court had not yet decided *Seminole Tribe*, so Congress
probably thought that Article I could support its all-out ab-
rogation of immunity.  See *supra,* at 6.  And to the extent it
relied on Section 5, Congress acted before this Court cre-
ated the "congruence and proportionality" test.  See *supra,*
at 11.  For that reason, Congress likely did not appreciate
the importance of linking the scope of its abrogation to the
redress or prevention of unconstitutional injuries—and of
creating a legislative record to back up that connection.  But
going forward, Congress will know those rules.  And under
them, if it detects violations of due process, then it may en-
act a proportionate response.  That kind of tailored statute
can effectively stop States from behaving as copyright pi-
rates.  Even while respecting constitutional limits, it can
bring digital Blackbeards to justice.

## III

*Florida Prepaid* all but prewrote our decision today.  That
precedent made clear that Article I's Intellectual Property

Clause could not provide the basis for an abrogation of sovereign immunity. And it held that Section 5 of the Fourteenth Amendment could not support an abrogation on a legislative record like the one here. For both those reasons, we affirm the judgment below.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–877

_____

## FREDERICK L. ALLEN, ET AL., PETITIONERS *v.* ROY A. COOPER, III, GOVERNOR OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 23, 2020]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I agree with the Court's conclusion that the Copyright Remedy Clarification Act of 1990, 17 U. S. C. §501 *et seq.*, does not validly abrogate States' sovereign immunity. But I cannot join the Court's opinion in its entirety. I write separately to note two disagreements and one question that remains open for resolution in a future case.

First, although I agree that *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999), is binding precedent, I cannot join the Court's discussion of *stare decisis*. The Court claims we need "'special justification[s]'" to overrule precedent because error alone "cannot overcome *stare decisis*." *Ante*, at 9–10. That approach "does not comport with our judicial duty under Article III." *Gamble* v. *United States*, 587 U. S. \_\_\_, \_\_\_ (2019) (THOMAS, J., concurring) (slip op., at 2). If our decision in *Florida Prepaid* were demonstrably erroneous, the Court would be obligated to "correct the error, regardless of whether other factors support overruling the precedent." 587 U. S., at \_\_\_–\_\_\_ (same) (slip op., at 8–9).

Here, adherence to our precedent is warranted because petitioners have not demonstrated that our decision in *Flor-*

*ida Prepaid* "is incorrect, much less demonstrably erroneous." *Gamble*, 587 U. S., at ___ (same) (slip op., at 17). The Court in *Florida Prepaid* correctly concluded that "Congress may not abrogate state sovereign immunity pursuant to its Article I powers," including its powers under the Intellectual Property Clause. 527 U. S., at 636 (citing *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 72–73 (1996)). Petitioners' claims to the contrary are unpersuasive.*

Second, I do not join the Court's discussion regarding future copyright legislation. In my view, we should opine on "only the case before us in light of the record before us." *Manhattan Community Access Corp.* v. *Halleck*, 587 U. S. ___, ___ (2019) (slip op., at 15). We should not purport to advise Congress on how it might exercise its legislative authority, nor give our blessing to hypothetical statutes or legislative records not at issue here.

Finally, I believe the question whether copyrights are property within the original meaning of the Fourteenth Amendment's Due Process Clause remains open. The Court relies on *Fox Film Corp.* v. *Doyal*, 286 U. S. 123 (1932), to conclude that "[c]opyrights are a form of property." *Ante*, at 11. But *Fox Film Corp.* addressed "property" in the context of state tax laws, not the Due Process Clause. 286 U. S., at 128. And although we stated in *Florida Prepaid* that patents are "property" for due process purposes, we did not analyze the Fourteenth Amendment's text, and neither of the cases we cited involved due process. 527 U. S., at 642 (citing *Brown* v. *Duchesne*, 19 How. 183, 197

_____

*Because I adhere to our precedents regarding Article I and state sovereign immunity, I continue to believe that *Central Va. Community College* v. *Katz*, 546 U. S. 356 (2006), was wrongly decided. See *id.*, at 379–385 (THOMAS, J., dissenting). The Court today rightfully limits that decision to the Bankruptcy Clause context, calling it a "good-for-one-clause-only holding." *Ante*, at 9. I would go a step further and recognize that the Court's decision in *Katz* is not good for even that clause.

(1857); *Consolidated Fruit-Jar Co.* v. *Wright*, 94 U. S. 92, 96 (1877)); see also Merrill, The Landscape of Constitutional Property, 86 Va. L. Rev. 885, 887 (2000) (noting that the "Court has not always been attentive to the 'property' threshold" of the Due Process Clauses).  Because the parties agree that petitioners' copyrights are property, and because the Fourteenth Amendment does not authorize this statute's abrogation of state sovereign immunity either way, we need not resolve this open question today.  I would, however, be willing to consider the matter in an appropriate case.

For these reasons, I join all of the Court's opinion except for the final paragraph in Part II–A and the final paragraph in Part II–B.

# SUPREME COURT OF THE UNITED STATES

No. 18–877

FREDERICK L. ALLEN, ET AL., PETITIONERS *v.* ROY
A. COOPER, III, GOVERNOR OF NORTH
CAROLINA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 23, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins,
concurring in the judgment.

The Constitution gives Congress certain enumerated
powers. One of them is set forth in the Intellectual Property
Clause: Congress may "promote the Progress of Science and
useful Arts, by securing for limited Times to Authors and
Inventors the exclusive Right to their respective Writings
and Discoveries." Art. I, §8, cl. 8. "And the monopoly rights
so given," the Court acknowledges, operate against "States
no less than private parties." *Ante*, at 6. States, in other
words, have "a specific duty" not to infringe that "is as-
signed by law" and upon which "individual rights depend."
*Marbury* v. *Madison*, 1 Cranch 137, 166 (1803). One might
therefore expect that someone injured by a State's violation
of that duty could "resort to the laws of his country for a
remedy," *ibid.*, especially where, as here, Congress has
sought to provide one. Or more concretely, one might think
that Walt Disney Pictures could sue a State (or anyone else)
for hosting an unlicensed screening of the studio's 2003
blockbuster film, Pirates of the Caribbean (or any one of its
many sequels).

Yet the Court holds otherwise. In its view, Congress'
power under the Intellectual Property Clause cannot sup-

port a federal law providing that, when proven to have pi-rated intellectual property, States must pay for what they plundered. *Ante*, at 6–10. To subject nonconsenting States to private suits for copyright or patent infringement, says the Court, Congress must endeavor to pass a more "tailored statute" than the one before us, relying not on the Intellec-tual Property Clause, but on §5 of the Fourteenth Amend-ment. *Ante*, at 16. Whether a future legislative effort along those lines will pass constitutional muster is anyone's guess. But faced with the risk of unfairness to authors and inventors alike, perhaps Congress will venture into this great constitutional unknown.

That our sovereign-immunity precedents can be said to call for so uncertain a voyage suggests that something is amiss. Indeed, we went astray in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), as I have consistently main-tained. See *College Savings Bank* v. *Florida Prepaid Post-secondary Ed. Expense Bd.*, 527 U. S. 666, 699–701 (1999) (dissenting opinion); *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 787–788 (2002) (same). We erred again in *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999), by holding that Congress exceeded its §5 powers when it passed a patent counterpart to the copyright stat-ute at issue here. See *id.*, at 652–664 (Stevens, J., dissent-ing). But recognizing that my longstanding view has not carried the day, and that the Court's decision in *Florida Prepaid* controls this case, I concur in the judgment. See *ante*, 9–10, 15–16; *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455–456 (2015); *Franchise Tax Board of California* v. *Hyatt*, 587 U. S. ___, ___ (2019) (BREYER, J., dissenting).