**[J-10A-2024 and J-10B-2024] [MO: Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| GARY D. WOLFE AND MARY O. WOLFE, HUSBAND AND WIFE, | : | No. 73 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| Appellants | : | Commonwealth Court at No. 649 CD |
| | : | 2022, entered on November 14, |
| | : | 2022, Reversing and Remanding the |
| v. | : | Order of the Berks County Court of |
| | : | Common Pleas, Civil Division, at No. |
| | : | 22-03762, entered on June 8, 2022. |
| READING BLUE MOUNTAIN AND NORTHERN RAILROAD COMPANY, | : | |
| | : | ARGUED: April 9, 2024 |
| | : | |
| Appellees | : | |
| | | |
| IN RE: CONDEMNATION OF LANDS OF GARY D. WOLFE AND MARY O. WOLFE POTTSVILLE PIKE, MUHLENBERG TOWNSHIP | : | No. 74 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 722 CD |
| | : | 2022, entered on November 14, |
| | : | 2022, Reversing and Remanding the |
| APPEAL OF: GARY D. WOLFE AND MARY O. WOLFE, HUSBAND AND WIFE | : | Order of the Berks County Court of |
| | : | Common Pleas, Civil Division, at No. |
| | : | 22-03847, entered on June 8, 2022. |
| | : | |
| | : | ARGUED: April 9, 2024 |

## CONCURRING OPINION

**JUSTICE MUNDY**                                   **DECIDED: August 20, 2024**

I agree the county court's order should be reinstated, although I differ with certain aspects of the majority's analysis, much of which proceeds from the premise that this Court's previous railroad decisions are materially distinguishable from the present case. I believe those decisions are largely on point, but I would conclude that, on the present record, the condemnor failed to demonstrate that its goals cannot be accomplished by locating the rail crossing south of the subject property.

As developed by the majority:  the Business Corporation Law gives public utilities – defined to include railroads subject to PUC regulation – eminent domain powers for purposes including transporting property by railroad; any such taking by a railroad is governed by the Eminent Domain Code (the Code); and nothing in the Property Rights Protection Act limits that authority.  *See* Majority Op at 16-17 (discussing statutory provisions and associated official comments).  Such powers are, of course, subject to the public-use predicate which is constitutionally imposed.  Further, under established Pennsylvania law, when a railroad files a declaration of taking, title vests in the railroad "on the date of the filing," 26 Pa.C.S. § 302(a)(2), and a rebuttable presumption arises that the taking is for an inherently public purpose.  *See* Majority Op. at 22 (citing cases).

It is undisputed that the taking in this matter was accomplished to connect an asphalt company, Russell Standard, with the overall rail network.  While acknowledging decisions from a century ago deeming such individual connections to embody an inherently public use in light of the public's need for the items in question, *see C.O. Struse v. Reading Co.*, 153 A. 350, 352 (Pa. 1931) (rail connection to Sears & Roebuck warehouse storing retail mail-order goods was for a public use); *Pioneer Coal v. Cherrytree & D.R. Co.*, 116 A. 45, 48 (Pa. 1922) (rail spur to connect with a single coal mine was for a public use), the majority distinguishes the present controversy on multiple grounds.  Most notably, the majority states that *Struse* and *Pioneer Coal* were decided in an earlier era when the American railway network was deemed inherently beneficial to the public – which the majority suggests is no longer true, *see* Majority Op. at 22; *see also id*. at 19 (indicating that, unlike today, the economy was "much more heavily dependent on railroads") – and it reasons that those cases also utilized a more lenient standard to evaluate the constitutional sufficiency of the claimed public benefit.  I have difficulty with this reasoning.

Initially, *Struse* and *Pioneer Coal*, both unanimous decisions by this Court, enjoy precedential status, and the majority does not assess whether an exception to the doctrine of *stare decisis* is presently implicated. In particular, the majority does not claim the prior cases were wrongly decided or that any special justification exists for this Court to cease following them. *See Commonwealth v. Alexander*, 243 A.3d 177, 196 (Pa. 2020) ("To reverse a decision, we demand a special justification, over and above the belief that the precedent was wrongly decided.") (quoting *Allen v. Cooper*, 589 U.S. 248, 259 (2020)). Insofar as the majority can be understood to proffer that the rail network is less important to the public now than it was when those cases were decided, we lack an adequate evidentiary record to make such a finding. While certainly we may take judicial notice that more people and goods are transported by automobile and aircraft now than they were at that time, it does not follow that, in our more complex society with almost three times as many people, rail transport is substantially less important. Further, the old cases were based on the concept that the entire rail network served the public, and the whole network necessarily includes each individual branch – including the branch to be constructed via the condemnation then at issue. There is no indication in the present case that that is any less true today than it was when *Struse* and *Pioneer Coal* were decided.[1]

---

[1] The majority implies the legal analysis in these older cases may not apply presently because it "was undergirded by the belief that construction and maintenance of railroad branches and spurs automatically served a 'public use' because of the infrastructure it created." Majority Op. at 19. However, the majority cites no authority suggesting that is any less true today. Notably, railroads are still public utilities under Pennsylvania law, *see* 66 Pa.C.S. § 102, and as late as 2006 when the General Assembly passed the Property Rights Protection Act it exempted railroads from the restrictions imposed. *See* 26 Pa.C.S. § 204(b). In my view, the legislative body is better positioned than this Court to pronounce when society has changed to the point that our rail infrastructure can no longer automatically be deemed to serve a public use. *See Villani v. Seibert*, 159 A.3d 478, 492 (Pa. 2016) (acknowledging the General Assembly's "superior resources and institutional prerogative in making social policy judgments upon a developed analysis").

Second, I am skeptical to the extent the majority suggests the standard for evaluating the constitutional validity of a taking is substantively stricter today than it was then. Initially, it bears noting that any such standard represents a judicial interpretation of the text in our organic law requiring that all takings be for a "public use." U.S. CONST. amend. V; PA. CONST. art. I, § 10; PA. CONST. art. X, § 4. If the standard really did change materially in the post-*Struse* timeframe, one would expect that some judicial opinion abrogating the prior standard, establishing a new one, and explaining why the prior cases were being overruled, would have been issued; yet the majority cites none and I am unaware of any.

The formulation in use today, that the public must be the "primary and paramount beneficiary" of the proposed use of the subject property, utilizes a phrase that originated in *Price v. Philadelphia Parking Authority*, 221 A.2d 138 (Pa. 1966), *see* Majority Op. at 20, but there is little reason to believe that in *Price* we set out to establish a new test. For one thing, and as the majority acknowledges, *Price* was not even a takings case, *see id*., and although *In re Bruce Avenue*, 266 A.2d 96 (Pa. 1970), which was an eminent domain dispute, quoted *Price*'s formulation, it did so without any elaboration and without implying that such phraseology reflected a break from the past. *See id*. at 99. Further, *Bruce Avenue* also continued to use the prior standard by specifying that, so long as the public good is enhanced, it is immaterial that some private interest may also be benefited. *See id*. (quoting *Belovsky v. Redevelopment Auth. of Phila.*, 54 A.2d 277, 283 (Pa. 1947)). This is the same essential concept that emerges from the older cases, where, for example, we acknowledged that a rail siding primarily benefits the public even though

there may be some incidental private benefit.[2]  To my mind, the "primary and paramount" language is simply a more modern label given to the same concept.

The majority's reliance on *Middletown Twp. v. Lands of Stone*, 939 A.2d 331 (Pa. 2007), and *In re Opening of Private Road for Benefit of O'Reilly*, 5 A.3d 246, 258 (Pa. 2010), also appears misplaced.  In *Lands of Stone*, a farm was condemned ostensibly for recreation, a valid public use, but we found recreation to be a *post-hoc* pretext, as we discerned the "true purpose" of the taking was to preserve open space, which was not within the township's eminent domain powers.  There is no issue of a pretextual taking in the present case.  Separately, *O'Reilly* found that the indirect benefit to the public of opening a private road to connect a landlocked property with a public road did not mean that the public was the *primary* beneficiary.  But that is distinct from a railway's connection via rail siding to a business supplying goods that benefit the public.  Here, it is clear Russell Standard cannot possibly be the sole beneficiary of the proposed rail link.  There are necessarily other entities such as businesses or government agencies on the other end that receive those products – and ultimately, as with the coal products at issue in *Pioneer Coal* and the Sears & Roebuck products at issue in *Struse* and *Pioneer Coal*, the public benefits in numerous ways from the supply of asphalt to the market.[3]

---

[2] *See Stoneboro & Chautauqua Lake Ice Co. v. Lake Shore & Mich. S. Ry. Co.*, 86 A. 87, 88 (Pa. 1913) (explaining that a rail siding is "impressed with a public use" which is not diminished by the circumstance that a private entity may have helped fund its construction in order to benefit from it); s*ee also Struse*, 153 A. at 351-52 (noting the proposed rail connection would benefit not only Sears but "a large percentage of the public," and stating a "public use" arises where the taking will directly "contribute to the general public welfare").

[3] Indeed, there are many socially-beneficial uses of asphalt, such as for roadways, driveways, tunnels, bridges, airport runways and taxiways, roofing, playgrounds, bicycle paths, running tracks, tennis courts, basketball courts, parking lots, barn floors, greenhouse floors, pipe coating, pipe joint fillers, ports, landfill caps, dam construction, retention pond lining, flood control and soil erosion uses, and building construction such as floorings.  *See* Becky Dunlavey, *What are the Uses for Asphalt* (Aug. 5, 2019), (continued…)

It may be true that Russell has previously shipped its products by truck, but it is evidently more cost effective to do so by rail, otherwise Russell would not be seeking to convert to rail transportation. And while there is an insufficient record to gauge just how much more cost effective it is, in the end societal resources are conserved when businesses convert to more cost-effective measures. As well, Reading Blue Mountain's *amici* notably argue there are substantial benefits relating to the environment, roadway wear-and-tear, and roadway safety for the traveling public, when businesses convert from truck to rail transportation.[4] Although, again, we lack an evidentiary record needed to quantify such improvements, my point is that such improvements exist and such a record could potentially be created in a future case – meaning it is ill advised to pronounce as a matter of law that the railway network is not as important to the economy as it was in a previous era.

With all of that said, I ultimately reach the same result as the majority. Although Reading's declaration of taking gave rise as a matter of law to a rebuttable presumption that the condemnation was for a public purpose, *see Bruce Avenue*, 266 A.2d at 99, I view this case as factually distinguishable from previous disputes in that the Wolfes rebutted that presumption by showing that an alternate rail crossing would serve the same

---

available at https://www.uniquepavingmaterials.com/what-are-the-uses-of-asphalt/ (last accessed July 26, 2024).

[4] *See, e.g.*, Brief for *Amici* CSX Transportation, Inc., Norfolk Southern Railway Co., and Consolidated Rail Corp., at 8-9 ("Together [railroads and short lines] form a connected interstate transportation network facilitating the movement of freight and goods vital to the United States and global economies. By reducing the number of large tractor trailers on America's streets, railroads also benefit the environment by contributing to the reduction of greenhouse gas emissions while promoting safety by decreasing highway congestion.").

purpose, *i.e.*, connecting Russell to the overall rail network.[5]  Consequently, and as the trial court found, the choice to locate the siding specifically on the Wolfes' property rather than at the alternative site was made primarily to serve the Reading's and Russell's private interest in saving time and money.  *See Wolfe v. Reading Blue Mountain & Northern R.R. Co.*, No. 22-3762, *slip op.* at 15-17 (C.P. Berks July 27, 2022) (adding that Russell also wished to avoid having stationary rail cars blocking access to its property, as would sometimes occur if the crossing were placed further south).  The burden then shifted back to Reading to demonstrate why that alternative crossing would be infeasible.[6]  Because Reading failed to make such a showing, I support the trial court's ultimate ruling that the taking was not for a public use.

Accordingly, I respectfully concur in the result reached by the majority.

---

[5] The hearing transcript reflects that the rail line, including its crossing of Route 61, could be placed sixty feet to the south of the proposed location and connect directly to Russell's business instead of traversing a portion of the Wolfes' land.  *See* N.T., 6/2/2022, at 80, 94; Majority Op. at 5-6.  Although this would require additional steps such as moving a fire hydrant, encasing utility lines in concrete, and seeking regulatory approval, there was no explanation at the hearing as to why those steps could not reasonably be taken.

[6] This type of burden shifting is well known in the law, and it naturally applies to a case like this one.  Such schemes are used or proposed elsewhere in takings law, such as with governmental public-necessity takings alleged to be infeasible, *see* Note, *This Land is My Land: The Need for a Feasibility Test in Evaluation of Takings for Public Necessity*, 78 CHI.-KENT L. REV. 1403, 1419 (2003), or takings claimed to reflect favoritism to private interests, *see* Note, *When the Legislature Robs Peter to Pay Paul: Pretextual Takings and Goldstein v. Pataki*, 30 MISS. C.L. REV. 87, 109-10 (2011) (borrowing from Supreme Court employment discrimination law).